Arthur **PERKINS,** Plaintiff,

v.

**LAKE COUNTY DEPARTMENT OF UTILITIES, et al., Defendants.**

No. 1:92CV0725.

United States District Court, N.D. Ohio, Eastern Division.

Aug. 11, 1994.

Frederick D. Middleton, Jr., Cleveland, OH, for plaintiff.

Michael P. Brown, Office Of The Pros. Atty., Painesville, OH, for defendants.

MEMORANDUM OPINION AND ORDER

PERELMAN, United States Magistrate Judge.

In this action this Court is confronted with the issue of the extent to which provable genetic/hereditary classification controls on the proposition of membership in a protected class within the meaning of Title VII, a question which may well be one of first impression.

This action, brought pursuant to the Civil Rights Act of 1964, 42 U.S.C. § 2000e (Title VII), was filed on April 10, 1992, alleging disparate treatment in the workplace due to Plaintiff's status as an American Indian. Plaintiff, Arthur Perkins, is employed as a Laborer for the Lake County Department of Utilities (hereinafter the Department). Defendants are the Department and three of its commissioners, John Platz, Robert Gardner and Mildred Teuscher.

Plaintiff alleges in his complaint that:

8. During the course of his employment Plaintiff was continually subjected to racial comments and discrimination by not being allowed to work overtime, only work the worse type of positions and not being promoted or allowed to test for promotions because of his race. Plaintiff's submission to this racial discrimination was imposed as a term or condition of employment.

9. Specifically on or about July 2, 1990 until the present, Plaintiff was subjected to the following acts of racial discrimination. He was denied as to a promotion to the position Site Supervisor I and a white male was placed in that position. He was denied opportunities to be tested to become a supervisor and improve his position in the company and this action was done in a manner and it resulted in a disproportionate number of minorities being adversely affected as compared to the white employees. In July, 1990, he was denied a promotion even though he was senior and more skilled at the job than the white employee who received this promotion. He was subjected to derogatory names or comments regarding his race, American Indian. He has been denied opportunities for employment in other departments of the Utilities Department which cause a disparate impact on the number of minorities employed at the department in supervisory and management positions. Plaintiff was denied the opportunities to be promoted or to apply for supervisory positions because of his race, an American Indian.

10. Other employees of the company have been given opportunities to acquire promotions to Chief Operator I and other administrative positions, while the minority employees such as Plaintiff were denied the opportunity and/or demoted to lower grade jobs. Plaintiff was denied promotions or offers to apply for open positions because of his race. Defendant had notice of the harassment and disparate treatment because it was pervasive and obvious.

11. The disparate treatment described above had a substantial detrimental effect on Plaintiff's employment, physical and psychological well being.

12. On or about July 2, 1991, Plaintiff was denied a promotion and a white male was given a supervisory position for which Plaintiff was qualified. This opening was available for white males but he was never given an opportunity to be considered for the position and he is the only minority of American Indian descent in the Lake County Utilities Department.

13. The acts of Defendant described above in this Complaint were done willfully, maliciously, outrageously, deliberately and purposely with the intention to inflict emotional distress upon Plaintiff and/or were done in reckless disregard of the probability of causing Plaintiff emotional distress. These acts did in fact result in severe and extreme emotional distress.

14. As a direct and proximate result of the Defendant's acts alleged herein, Plaintiff was caused to incur severe and grievous mental and emotional suffering, shock, nervousness, anxiety and loss of wages and benefits. For this harm, Plaintiff demands compensatory damages in the sum of Seven Hundred Forty–Five Thousand Dollars ($745,000.00).

Defendants have filed two motions for summary judgment. The first seeks partial summary judgment on Plaintiff's allegations that he was unlawfully denied promotions and promotion opportunities by reason of his national origin, on the basis that under Ohio law he is disqualified from holding the positions he sought.

Defendants' second motion for summary judgment presents the philosophic and pragmatic question alluded to in the introduction to this opinion. That motion attacks Plaintiff's Title VII claims on the ground that Plaintiff is not, in fact, an American Indian and, therefore, not being a member of a class protected by Title VII cannot make out a prima facie case of discrimination thereun-

der.[1] It is this motion which will be first addressed in this ruling.

The disposition of a motion for summary judgment is governed by Rule 56(c) of the Federal Rules of Civil Procedure, which provides for the granting of such motion where, "[T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." It is the court's function under such a motion to determine whether a genuine issue of material fact exists, as opposed to endeavoring to resolve any such factual issues. *Tee–Pak, Inc. v. St. Regis Paper Co.*, 491 F.2d 1193 (6th Cir.1974); 6 *Moore's Federal Practice* ¶ 56.15[1.–0].

In *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir.1989), the Sixth Circuit Court of Appeals reviewed the related decisions of the Supreme Court in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), and *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), which addressed summary judgment practice, referring to those rulings as establishing a "new era" of "dramatic change" in that area of practice, one in which summary judgment is to be viewed with "more favorable regard". The court summarized those rulings as standing for a number of new principles in summary judgment practice, including the fact that cases involving considerations of state of mind issues are not automatically inappropriate for summary judgment; that a federal directed verdict standard ("whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law") should be applied to summary judgment motions; that a non-moving party must provide "more than a mere scintilla of evidence" to avoid summary judgment; that the substantive law

applicable to the cause of action will govern the materiality of the issues of fact; that the court has no duty to search the record to determine the existence of genuine issues of material fact; and, perhaps most significant, that the "new era" allows a trial court more discretion in weighing the evidence offered by the non-moving party, considered in light of the whole record, to determine whether that party's evidence does "more than simply show that there is some metaphysical doubt as to the material facts" or whether it demonstrates that the non-moving party's claims are "implausible". *Id.* at 1479–1480 (Footnotes and citations omitted.)

Title VII provides in part:

(a) It shall be an unlawful employment practice for an employer—

(1) to ... discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]

Plaintiff seeks relief under Title VII on the basis of alleged discrimination by reason of national origin. Under the standards articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), in order to proceed on such a claim Plaintiff must make out a *prima facie* case of discrimination, which includes evidence that he is a member of a protected class within the reach of Title VII.

Defendant's motion presents this Court with two questions: (1) whether Plaintiff is an American Indian, for Title VII purposes; and, (2) if not, whether he can nevertheless obtain Title VII relief for discrimination based upon his and his employer's mistaken belief that he is an American Indian.

As will appear hereinafter, this Court must find the present answer to the first question to be an equivocal "maybe." As to the second, the answer turns upon a number of considerations also relevant to the first, and,

---

1. To the extent that the complaint can be read to include a state common law claim for intentional infliction of emotional distress that claim is not addressed by either of Defendants' two motions. It is also noted that the motions do not address the substantive merits of Plaintiff's lawsuit.

in the exercise of literary license, this Court will withhold that answer for the time being.[2]

■ Defendants offer as proof of their contention that Plaintiff is not a member of the class for which he seeks Title VII protection the affidavit of Paula Shepherd in which Ms. Shepherd avers in pertinent part:

1. Affiant is a resident of Burton, Ohio and is expert in the field of tracing family ancestry and race.

2. Affiant's resume is attached hereto establishing my credentials as an expert in such field, Exhibit 1.[3]

3. Affiant has detailed experience in tracing ancestry back through native American Indians.

4. Affiant was retained by the Lake County Board of Commissioners and Lake County Department of Utilities to research the ancestry and racial composition of Arthur Perkins, Jr. (hereafter "Perkins"), an employee of the Lake County Department of Utilities.

5. Affiant performed exhaustive research of said ancestry and racial composition through the U.S. census, birth and death records, Bureau of Indian Affairs documentation, Smithsonian Institute documentation and literature, United States of America documentation, funeral home records, National Genealogical Society Quarterly literature, Goins family newsletters and records, Cherokee Nation research, tombstone information, Salt Lake City Mormon records, United States National Archives records, and many other sources.

6. Affiant prepared a pedigree chart for Arthur Perkins, Jr., attached hereto as Exhibit 2.

7. The birth record of Arthur Perkins, Jr. indicates that he is white, and that his parents, Rosa Ashworth Perkins and Arthur Perkins, Sr., are both white. See Exhibit 3.

8. Arthur Perkins, Sr.'s (Perkin's father) two parents were Joshua Perkins and Elizabeth Betty Perkins. Joshua and Elizabeth were first cousins. According to the death certificates of both they were white. See Exhibits 4 and 5.

9. Affiant has made a study of the United States census and its various components and changes through the decades. References are to "200 Years of U.S. Census Taking: Population and Housing Questions, 1790–1990," "U.S. Dept. of Commerce (1989). In the 1830 and 1840 censuses, the choice for race included only "Free White Persons," "Slaves," and "Free Colored Persons." *Id.* at 20. The purpose of the census up to and including 1840 was to determine who should be paying taxes. Indians were not included on the census since they did not pay taxes. It would have been wise, in a fashion, for a person to claim Indian heritage on the census since that person would not be required to pay taxes. In 1870, the census added the category of "Mulatto." "Be particularly careful in reporting the class Mulatto. The word here is generic, and includes quadroons, octoroons, and all persons having any perceptible trace of African blood." *Id.* at 26.[4] In 1880, the census was altered to allow for the following races: White, Black, Mulatto, Chinese and Indian. The 1890 census included various degrees of Mulatto, such as "Octoroon" and "Quadroon." The 1900 census did not include a Mulatto classification. The 1910 census classified Mulatto as "Other." The 1920 census stated that "A person of mixed White and Indian blood was to be returned as an Indian, except where the percentage of Indian blood was very small or where he or she was regarded as White in the community."

---

2. For those readers who cannot resist peeking at the last page of a "whodunit" while halfway through the book, you may turn to pages 1277–1278.

3. Although Ms. Shepherd declares herself to be an expert in the field of tracing family ancestry and race, determinations of the expertise of witnesses are for the court to make. *Mannino v. International Manufacturing Co.,* 650 F.2d 846 (6th Cir.1981).

4. "Mulatto" is presently defined as "a person of mixed white and Black ancestry." The American Heritage Dictionary of the English Language, (3rd ed. 1992).

There was even a column to indicate the percentage of Indian blood and tribe. *Id.* at 60.

10. The parents of Joshua Perkins (Perkins' paternal grandfather) were Isaac Perkins and Frances Goins. According to the 1840 census, Isaac Perkins was "Free colored." Mulatto was not a choice in the 1840 census. The 1850, 1860, 1870 and 1880 censuses indicated that Joshua Perkins was a Mulatto. Similarly, Frances "Fanny" Goins, in the 1850, 1860 and 1870 censuses, was listed as Mulatto. Eleven children were all also listed as Mulatto. Affiant can find no provable prior family link to Goins.

11. The Goins family traces its roots back to Virginia in the 1600's. See National Genealogical Society Quarterly, Volume 80, Number 1, March, 1992, attached hereto as Exhibit 6.

12. The parents of Isaac Perkins were George Perkins and Mary Ashworth. George Perkins was listed as "Free Colored" in the 1810 and 1830 censuses. In 1850 he was censused as Mulatto. In the 1830 census, Mary Ashworth was listed as "Free Colored," while in 1850 she was listed as Mulatto. Available racial data by census for their thirteen children indicates Mulatto.

13. The parents of Elizabeth Perkins (Perkins' paternal grandmother) were Stephen Perkins and Penelope Windham. Both were initially censused as "Free Colored." In 1850, 1860, 1870 and 1880, Stephen Perkins was listed as Mulatto. In 1850 and 1860, Penelope Windham was listed as Mulatto. Their five children were listed as Mulatto.

14. The parents of Stephen Perkins were George Perkins and Mary Ashworth. These are the same parents as those of Isaac Perkins. The parents of Mary Ashworth, James Ashworth and Keziah Dyal, emigrated to Louisiana in 1799, first to Weeks Island, and then to Choupique, south of Sulphur in Calcasieu Parish. All according to a learned treatise on the subject, "SWEAT Families of the South," by Ebron W. Wise (1983), p. 110, 111.

15. The parents of Penelope Windham were Moses Windham and Jeane Bass. In the 1840 census, both were listed as "Free Colored." In 1850, there is no listing for Moses Windham, but Jeane Bass was listed as Mulatto. In the 1860 census, Jeane Bass was married to Daniel Perkins, and in the 1870 census, Jeane Bass was married to Alexander Buxton. The children of the first marriage, including Penelope Windham, numbered eight, all Mulatto.

16. This concluded the family history, back through $\frac{1}{32}$ composition, and there is no indication from this information, or other family history collected through various treaties written on these families that there is any perceptible degree of Indian blood.

17. Since Arthur Perkins, Jr. claimed in his deposition that he was Cherokee Indian on his mother's side, this side will be further examined.

18. As stated earlier, Perkins' mother is Rosa Ashworth. In the 1920 census, the most current available census, Rosa Ashworth was listed as White.

19. Rosa Ashworth's parents were Henderson Ashworth and Rosella Droddy. Henderson Ashworth and Rosella Droddy were both listed in the 1900, 1910, and 1920 censuses as White. Their four children were also listed as White. Henderson Ashworth's death certificate lists his race as White. See Exhibit 10.

20. Henderson Ashworth's parents were Napoleon Ashworth and Elizabeth Howard. In 1860 through 1880, Napoleon Ashworth was classified as Mulatto. In 1900 he was classified as White. There was no classification for Mulatto in 1900. In 1910 he was classified as White. There was a 1910 classification for Mulatto, but the definition did not require merely a "perceptible trace of African blood." Napoleon Ashworth was most likely more White than Black. Elizabeth Howard was listed as Mulatto in 1880, and White in 1900 and 1920. The three children are also all listed as White for 1900 and thereafter.

21. Napoleon Ashworth homesteaded on June 4, 1891 in Louisiana. The appropriate certified documentation is attached hereto as Exhibit 7. Historically, an Indian could not legally homestead at that time, therefore, Napoleon Ashworth could not have been an Indian.

22. The parents of Napoleon Ashworth were Isaiah Ashworth and Hannah Perkins. Isaiah Ashworth and Hannah Perkins were both censused as Mulatto in 1860, 1870 and 1880. Their twelve children were all also listed as Mulatto.

23. The parents of Elizabeth Howard were Emanual Howard and Nancy Howard.

24. Rosella Droddy's parents were William Droddy and Nancy Ware. William Droddy is always listed as White in 1880, 1900, and 1910. Nancy Ware is always listed as White in 1880, 1900, 1910, and 1920. The eight children are all listed as White.

25. William Droddy's parents were John Droddy and Elizabeth Droddy. John Droddy was listed as White for census years 1880, 1900, and 1920. Elizabeth Droddy is similarly listed as White. All six children are listed as White.

26. Nancy Ware's parents were James Ware and Carolyn Perkins. James Ware has always been censused as White. Carolyn Perkins has always been listed as White. Their eleven children were all always censused as White.

27. Attached as Exhibit 8 are the family group records which I have created to summarize available census data for Perkins ancestral families.

28. Attached as Exhibit 9 is a summary of my investigation on census records of Southwest Louisiana.

29. Affiant submitted all of these available names to Genealogical Research, which performed research on the issue of whether any of these names appeared on any of the federally recognized rolls for the Cherokee Nation. A copy of their affidavit summarizing their findings is attached hereto indicating that none of these individuals, including Arthur Perkins, Jr., was an enrolled member of any tribe of the Cherokee Nation, his claimed ancestry.

30. Attached hereto as Exhibits 11 and 12 are pertinent sections of Volumes I and II of the Preliminary Inventories from the National Archives of the United States, Records of the Bureau of Indian Affairs. These records list the recognized tribes and reservations of native american Indians. There is no listing for "Redbones."

31. Attached Exhibits 13 through 38, inclusive, are certified copies from the National Archives and Records Commission illustrating the records searched for the five recognized Indian Nations for all available ancestors of Arthur Perkins, Jr.

32. None of the Exhibits 13 through 38, inclusive, indicate that any of the ancestors of Arthur Perkins, Jr. was a member of any of said Nations or tribes thereof.

33. Affiant searched these records, and all other pertinent records at the National Archives and Records Commission in making such determination. U.S. Census profiles (worksheets that affiant completed) are attached as Exhibits 39 through 45, inclusive. 1920 U.S. Census rolls, as certified copies are attached as Exhibits 46 through 49, inclusive. 1910 U.S. Census rolls, as certified copies, are attached as Exhibits 50 through 52 inclusive. 1900 U.S. Census rolls, as certified copies, are attached as Exhibits 53 through 56 inclusive. 1880 U.S. Census rolls, as certified copies are attached as Exhibits 57 through 61 inclusive. 1870 U.S. Census, as certified copies, are attached as Exhibits 62 through 66 inclusive. The Louisiana index for 1870 is attached as Exhibit 67. 1860 U.S. Census rolls, as certified copies, are attached as Exhibits 68 through 71 inclusive. The 1860 Louisiana index is attached as Exhibit 72. 1850 U.S. Census rolls, as certified copies, are attached as Exhibits 73 through 77, inclusive. The 1850 Louisiana index is attached as Exhibit 78. The 1850 Texas index is attached as Exhibit 79. 1840 U.S. Census rolls, as

certified copies, are attached as Exhibits 80 through 83, inclusive. The two Louisiana indices are attached as Exhibit 84 and 85.

34. After reviewing all of the research enumerated herein, and applying my skills as a genealogical researcher, it is my expert opinion to a reasonable degree of professional and expert certainty that Arthur Perkins, Jr. has no provable ancestral ties to any of the recognized Indian Nations.

35. It is also my opinion that Arthur Perkins, Jr., has less than one sixteenth (¹⁄₁₆th) Indian blood.

36. Finally, it is my expert opinion that Arthur Perkins, Jr. has no significant percentage of Indian blood.

The documentation upon which Ms. Shepherd bases her conclusions is attached to Defendants' brief, including the birth and death certificates cited by Ms. Shepherd in her affidavit in which Plaintiff's race and those of his immediate relatives are listed as "white." No member of Plaintiff's family tree is designated "Indian" on any documents before this Court.

Defendants also submit various documents including certificates of homesteading referred to in Ms. Shepherd's affidavit, as well as Indices and Rolls listing members of various tribes. Although a number of "Perkins" and some other family names are listed on the Rolls Ms. Shepherd avers that there is no indication that any of them are ancestors of Plaintiff.[5]

Defendants additionally direct this Court's attention to a number of cases in which the term "Indian" has been defined in various contexts. Defendant's assert that these cases preclude a finding that Plaintiff falls into that racial category.

In response, Plaintiff has submitted a number of affidavits, including his own in

which he avers in part "[a]ffiant is an American Indian and his parents have always told him of his Indian heritage and they have acknowledged their Indian heritage all their life." Plaintiff has additionally submitted affidavits from his mother, Rosa Perkins; his brothers, George, Tony and James Perkins; his sisters, Hazel Cormier, Billie Mae Courts and Anna Faye Jones; and his brothers-in-law, Lee Roy Baily, Carson Jones and Donald L. Courts.

In her affidavit Plaintiff's mother avers:

1. Affiant is the Mother of Arthur Perkins, Jr. born in Singer, Louisiana on September 28, 1952.

2. Affiant knew Arthur Perkins, Sr. and that he had American Indian heritage.

3. Affiant has been a resident of Louisiana all her life and knows the local history and family heritage.

4. Affiant knows thru the Perkins family history that Arthur Perkins, Jr. is a descendant of an American Indian and that Arthur Perkins, Jr. can rightfully claim to be an American Indian.

5. The Perkins family has claimed American Indian heritage and Arthur Perkins, Sr. has publicly claimed his American Indian heritage during his lifetime.

6. Affiant states that Arthur Perkins, Jr. is an American Indian according to his family history.

The remaining affidavits of family members are identical to that of Rosa Perkins, except as to the names and residences of the affiants.

Plaintiff also points to the deposition of Melton Fletcher in support of his contention that he is a Native American.

Mr. Fletcher described himself as a licensed social worker and "the program coordinator for the North American Indian Cultural Center." He testified that he had

---

5. Although the exhibits submitted in support of Ms. Shepherd's affidavit are imposing, it is difficult for this Court to fully determine their significance, particularly with respect to the tribal Indices and Rolls. For instance, several of the copied pages of the Rolls submitted to this Court do not cover the portion of the alphabet which would include some of Plaintiff's relatives who do not have the name Perkins. The inherent difficulty of proving a negative, as well as this Court's ignorance concerning tribal membership and enrollment, make it unclear whether all relevant Indices and Rolls were examined and submitted. This Court does not impugn Ms. Shepherd's study, but merely wonders, is there more?

worked as an Indian Affairs Specialist since 1957. He further stated that he was familiar with a "Perkins" family from Singer, Louisiana, with whom he had lived for a short period of time when he was child and who were Native Americans. Under cross-examination Mr. Fletcher acknowledged that he did not know if Plaintiff was related to the Perkins family that he knew in Louisiana.

Mr. Fletcher testified that Native Americans in the area of Singer, Louisiana called themselves "Redbones," and that when he first met Plaintiff in connection with this lawsuit and learned that Plaintiff was from Singer Mr. Fletcher said "Well, you are a Redbone." With respect to the term "Redbone" Mr. Fletcher offered the following explanation of its meaning:

Q. And where did that term, "Redbone" come from?

A. Well, I really don't know. That was before my time, but I do know what happened there.

Q. What did happen?

A. Well, it was two brothers and one married a black lady and the other one married another Indian. And one Indian went on one side of the road, on Bear Creek, and they settled on that side. And the black Indian went on the other side and they settled on that.

Q. And they were called Redbones?

A. They were called Redbones.

He testified that the term "Redbone" was a "derogatory remark" and that he considered it a racial slur. It is undisputed that "Redbone" is not a federally registered indian tribe.

As to Plaintiff's personal appearance Mr. Fletcher stated that there was no doubt in his mind that Plaintiff is a Native American. While acknowledging that although himself an American Indian he had been mistaken on a number of occasions for an Italian or a Mexican, Mr. Fletcher reiterated on cross-examination that:

A. I said that he appeared to look like an Indian to me. He certainly—I've been around a lot of native people, and him walking in my door, I—it would be very hard for me to mistake him for anything else.

Q. Okay. Any specific features that indicate that to you?

A. Well, yes. You could tell by his facial structure, is one thing.

Q. Okay.

A. The other thing, he just—Indians look Indians. They have facial features, you know, about them and the complexion, that it would be hard to discern. They'd either have, number one, the facial features or the complexion.

\* \* \* \* \* \*

A. You know, but I'm around Indians every day, every day, and you just can't hardly miss some feature in them, regardless of how much they've been mixed.

With respect to his physical characteristics and the perceptions of his employers and co-workers Plaintiff submitted affidavits of co-workers, Barry Traxler, Glenn Cahill, Joseph Nadock, and James Needler in which the affiants signed substantially (not to mention suspiciously) identical affidavits stating in part that Plaintiff "appears to be an American Indian and he always claimed to be an American Indian[.]"

It is undisputed by Defendants that, without regard to whether Plaintiff is or is not demonstrably an American Indian, he considers himself and holds himself out to be such. Moreover, it appears that at least until institution of this action Defendants considered him to be such. This is evident by the fact that it was not until well into the litigation of this action that Defendants challenged his membership in that class. Additionally, Plaintiff was apparently listed in Defendants' records as an American Indian. Although the statistical records kept by Defendants do not list the racial background or nationality of its employees by name, Defendants' records include only one American Indian, and there is no indication that the employee so listed was other than Plaintiff.

■ Upon this evidentiary background this Court addressed the first question—Is Plaintiff an American Indian?

While this question is simple and would seem to be amenable to a straightforward answer, this Court has discovered that the issue of membership in a given racial classification is deceptively complex. It is complicated first by the amorphous definition of the term "race," and second by the difficulty of categorizing individuals with varied and/or unclear ancestry within a particular racial grouping.

The issue of who belongs in what racial classification has occupied the minds of Americans throughout the history of this country.

Regrettably, racial classifications may be, and traditionally have been, used to justify the exploitation of certain groups. Ashley Montagu, *Man's Most Dangerous Myth: The Fallacy of Race* 38 (1964) ("It was only among peoples who had themselves for centuries been emancipated from serfdom and slavery, but who themselves kept slaves, that the hereditary or biological conception of race differences was developed.") More recently, racial classifications have been used as a method of determining entitlement to certain government subsidized benefits. Consequently, the incentive or disincentive to categorize oneself as a member of a particular minority class has varied over the years.

The traditional racial categorizations of Negroid, Caucasoid, and Mongoloid have been narrowed, expanded, and/or reconfigured by various social scientists and other disciplines over the years to the point that the very notion of "race" may be deemed illusory. *See* Stanley M. Garn, Ph.D., *Human Races* 15 (3rd ed. 1971) (surveying theories of racial categories); Montagu, *supra*, at 30 (dividing the human population into four "major groups" rather than "races.") [6]

Historically, racial classification in America arises out of what is apparently a uniquely "American institution known informally as 'the one-drop rule,' which defines as black a person with as little as a single drop of 'black blood.' This notion derives from a long-discredited belief that each race had its own blood type, which was correlated with physical appearance and social behavior." Lawrence Wright, *One Drop of Blood*, The New Yorker, July 25, 1994, 46, 48.

With the "one-drop rule" falling into deserved disrepute no easy classification system has taken its place, and issues of membership in a particular racial classification have been ill-defined and subjective.

Whatever the word "race" may mean elsewhere in the world, or to the world of science, it is clear that in America the categories are arbitrary, confused, and hopelessly intermingled. In many cases, Americans don't know who they are racially speaking. A National Center for Health Statistics study found that 5.8 per cent of the people who called themselves Black were seen as White by a census interviewer. Nearly a third of the people identifying themselves as Asian were classified as White or Black by independent observers. That was also true of seventy per cent of people who identified themselves as American Indians. Robert A. Hahn, an epidemiologist at the Centers for Disease Control and Prevention, analyzed deaths of infants born from 1983 through 1985. In an astounding number of cases, the infant had a different race on its death certificate from the one on its birth certificate[.]

L. Wright, *supra*, at 53.

As early as 1934 the United States Supreme Court recognized that there was no strict formula for determining racial class. In a general discussion concerning naturalization the Supreme Court inserted an elastic element into the determination of race, explaining, "men are not white if the strain of colored blood in them is a half or a quarter,

---

**6.** In 1973 the Federal Interagency Committee on Education proposed five racial categories, American Indian or Alaskan Native, Asian or Pacific Islander, Black, White, and Hispanic. These categories are illustrative of the difficulty of racial classification. If common ancestry is the criterion upon which race is based American Indians and Asians could have been categorized under one category arising from Mongoloids. If skin color was the criterion the racial grouping could have the result of creating the anomalous situation of some "whites" having darker skin than some "blacks," as Blacks were defined as having African descent and could be lighter skinned than Whites, which included Arabs and Asian Indians. Lawrence Wright, *One Drop of Blood*, The New Yorker, July 25, 1994, 50.

or, not improbably, even less, the governing test always being that of common understanding." *Morrison v. California*, 291 U.S. 82, 86, 54 S.Ct. 281, 283, 78 L.Ed. 664 (1934). More recently, the Supreme Court recognized the problematic nature of racial categorization in *St. Francis College v. Al-Khazraji*, 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987) as follows:

> Many modern biologists and anthropologists, however, criticize racial classifications as arbitrary and of little use in understanding the variability of human beings. It is said that genetically homogeneous populations do not exist and traits are not discontinuous between populations; therefore, a population can only be described in terms of relative frequencies of various traits. Clear-cut categories do not exist. The particular traits which have generally been chosen to characterize races have been criticized as having little biological significance. It has been found that differences between individuals of the same race are often greater than the differences between the "average" individuals of different races. These observations and others have led some, but not all, scientists to conclude that racial classifications are for the most part sociopolitical, rather than biological, in nature.

*Id.* at 610 n. 4, 107 S.Ct. at 2027 n. 4. *See also, McClesky v. Kemp*, 481 U.S. 279, 316 n. 39, 107 S.Ct. 1756, 1781 n. 39, 95 L.Ed.2d 262 (1987) ("in our heterogeneous society the lower courts have found the boundaries of race and ethnicity increasingly difficult to determine.")

Lower courts have also questioned the efficacy of racial classification.

> The terms "race" and "racial discrimination" may be of such doubtful sociological validity as to be scientifically meaningless, but these terms nonetheless are subject to a commonly-accepted, albeit sometimes vague, understanding. Those courts which have extended the coverage of § 1981 have done so on a realistic basis, within the framework of this common meaning and understanding. On this admittedly unscientific basis, whites are plainly a "race" susceptible to "racial discrimination;" His-

panic persons and Indians, like blacks, have been traditional victims of group discrimination, and, however inaccurately or stupidly, are frequently and even commonly subject to a "racial" identification as "non-whites."

*Budinsky v. Corning Glass Works*, 425 F.Supp. 786, 788 (W.D.Pa.1977). The thread running through such cases is that "race" is not a static concept. It lives and changes according to popular beliefs.

> "Race," it should always be remembered is a human grouping which is culturally defined in a given society. "Race prejudice" is a system of reciprocal relations of stereotyping, discrimination, and segregation existing between human groupings which are considered as "races."

Montagu, *supra* at 137 (footnotes omitted).

The difficulty of placing individuals into racial categories is compounded in Title VII, because Title VII further categorizes and distinguishes national origin as a category presumably different from that of race. This very distinction between classifications based upon race and nationality illustrates the perception-oriented nature of the term "race."

This race-versus-national-origin complication is reflected in cases involving 42 U.S.C. § 1981, which has been held to protect individuals from racial discrimination. Many courts, when deciding § 1981 cases, have faced the challenge of determining whether a plaintiff was discriminated against due to his or her race, which is prohibited, or, rather, as a result of his or her national origin, which, arguably, is not prohibited by that statute. In engaging in the mental gymnastics arising out of this distinction courts have strived to define and distinguish the two terms with varying degrees of success.

This issue was addressed in *Ortiz v. Bank of America*, 547 F.Supp. 550 (E.D.Cal.1982), in which the court stated:

> As I will discuss more fully later in this opinion, I have serious doubt that race can be defined in contradistinction from national origin in any meaningful fashion. The difficulties in defining race often present themselves in attempting to define such terms as "Hispanic." For instance, is

someone of native Indian descent who comes from present day Mexico a Hispanic? Even more importantly, should the government or the courts be in the business of "certifying" bloodlines and races? *Id.* at 559 n. 16. That court went on to question whether there is even an articulable distinction between the concepts of "race" and "national origin." *Id.* at 560 ("the notion of 'race' as contrasted with national origin is highly dubious"). *See also, Aponte v. National Steel Service Ctr.,* 500 F.Supp. 198 (N.D.Ill.1980) (distinguishing between "white" and "non-whites" rather than "race" and "national origin" for § 1981 purposes).[7]

In *Anooya v. Hilton Hotels Corp.,* 733 F.2d 48 (7th Cir.1984) the concurring opinion concluded that the plaintiff had no § 1981 action as a result of discrimination against him due to his national origin of Iraqi, but suggested that had the plaintiff plead discrimination on the basis of skin color the action would have been one under race discrimination. *See also, Abdulrahim v. Gene B. Glick Co.,* 612 F.Supp. 256, 263 (N.D.Ind. 1985) (discrimination based on skin color creates action based on race.)

Implicit in the holdings that discrimination on the basis of skin color amounts to racial discrimination is that a plaintiff's skin color, rather than indicating in positive terms what the race of the plaintiff is, appears merely to indicate the negative, that he or she is not white, thus, essentially breaking race down into two categories, white and non-white. *Gonzalez v. Stanford Applied Engineering,* 597 F.2d 1298, 1300 (9th Cir.1979). It is the skin color leading to the perception that the person is "different" from the white majority that leads to discrimination.

That such perception plays an important role in determining who is a member of a minority group for purposes of Title VII is illustrated in the Code of Federal Regulations definition of national origin discrimination. C.F.R. § 1606.1 provides in part:

> The Commission defines national origin discrimination broadly as including, but not limited to, the denial of equal employment opportunity because of an individual's, or his or her ancestor's, place of origin; or because an individual has the physical, cultural or linguistic characteristics of a national origin group.

Under this definition physical characteristics associated with a particular nationality may be all that is necessary to show membership in a class, without regard to percentage of blood traceable to that nation.

Likewise, subjective perception of an individual's race clearly plays an important role in racial classification where discrimination is involved. This Court has never encountered an instance in which an employer admittedly first checked the pedigree of an employee before engaging in discriminatory conduct. "Historically, common notions of race divided people either along national lines or the perceiver's subjective evaluation of skin pigmentation.... The idea of race as an element of the history of ideas in this country has frequently been no more than a vehicle for racism, i.e., a presumed inherited defect in those who are not of the racist's kind, however he defines his kind." *Ortiz,* 547 F.Supp. at 567.

Having considered the amorphous and subjective nature of racial classification in general, this Court must examine the subsidiary issue of categorizing an individual within a particular race.

As far as designation of individuals as Native Americans is concerned, there is no hard and fast rule.

---

7. It is noted that with respect to Native Americans it is not always clear whether a particular court categorizes them according to racial classifications or by national origin. *See e.g., Toledo v. Nobel–Sysco, Inc.,* 892 F.2d 1481 (10th Cir.), *cert. denied,* 495 U.S. 948, 110 S.Ct. 2208, 109 L.Ed.2d 535 (1989) (addressing discrimination against American Indians in terms of both national origin and race); *Maier v. Police & Fire Federal Credit Union,* 813 F.Supp. 326 (E.D.Pa. 1993) (same); *Scott v. Eversole Mortuary,* 522 F.2d 1110 (9th Cir.1975) (although court did not address issue of whether discrimination against Native American constituted racial or nationality discrimination it held that American Indian could state a claim under 42 U.S.C. § 1981 which arguably protects only on the basis of race); *Gonzalez v. Stanford Applied Engineering Inc.,* 597 F.2d 1298, 1300 (9th Cir.1979) (suggesting that discrimination on the basis of skin color is racial discrimination without regard to any scientific distinction between races).

"The term 'Indian' is used in several contexts including biological descent, cultural identity and legal status." *United States v. State of Washington,* 476 F.Supp. 1101, 1103 (W.D.Wash.1979), *aff'd,* 641 F.2d 1368 (9th Cir.1981), *cert. denied,* 454 U.S. 1143, 102 S.Ct. 1001, 71 L.Ed.2d 294 (1982). It is said that:

> From a legal standpoint, then, the biological question of race is generally pertinent, but not conclusive. Legal status depends not only upon biological, but also upon social factors, such as the relation of the individual concerned to a white or Indian community. This relationship, in turn, has two ends—an individual and a community. The individual may withdraw from a tribe or be expelled from a tribe; or he may be adopted by a tribe. He may or may not reside on an Indian reservation. He may or may not be subject to the control of the Federal Government with respect to various transactions. All these social or political factors may affect the classification of an individual as an "Indian" or a "non-Indian" for legal purposes, or for certain legal purposes. Indeed, in accordance with a statute reserving jurisdiction over offenses between tribal members to a tribal court, a white man adopted into an Indian tribe has been held to be an Indian, and the decided cases do not foreclose the argument that a person of entirely Indian ancestry who has never had any relations with any Indian tribe or reservation may be considered a non-Indian for most legal purposes.

> What must be remembered is that legislators, when they use the term "Indian" to establish special rules of law applicable to "Indians," are generally trying to deal with a group distinguished from "non-Indian" groups by public opinion, and this public opinion varies so widely that on certain reservations it is common to refer to a person as an Indian although 15 of his 16 ancestors, 4 generations back, were white persons; while in other parts of the country, as in the Southwest, a person may be considered a Spanish–American rather than an Indian although his blood is predominantly Indian.

*Felix S. Cohen's Handbook of Federal Indian Law,* 2 (Univ. of New Mex. Press 1971).

Individual tribes frequently have constitutions defining who can be considered a member of that tribe. *See State of Washington,* 476 F.Supp. at 1104–1110 (Duwamish Tribe constitution requires Indian blood, although something less than full-blood, and descent from Duwamish tribe; Samish Tribe requires Indian blood of as little as $\frac{1}{32}$nd, and name on official membership roll; Snohomish Tribe—Indian blood with no minimum amount, and listing on specified rolls; Snoqualmie—$\frac{1}{8}$th blood; Steilacoom—enrollment in Tribe and descent from Indian.)

There being no definitive test for labeling an individual as "Indian" or "non-Indian," this Court has reviewed the cases cited by Defendants and surveyed cases from other federal courts in search of criteria for such determination. Although this Court was unable to locate any cases in which an individual's status as a Native American was challenged within the context of a statute prohibiting racial discrimination it has arisen in other contexts, and a brief review of some of those cases may be instructive here.

Several cases in which an individual's status as an "Indian" was important involved The Major Crimes Act, 18 U.S.C. § 1153,[8] which provides for federal criminal jurisdiction in instances of specified crimes by an Indian in Indian country. With respect to interpretation of that statute a case by case test has arisen for determining whether a particular defendant is an "Indian." Among the factors which have been considered are degree of Indian blood, recognition by the tribe or government as an Indian, and residence on an Indian reservation. *United States v. Broncheau,* 597 F.2d 1260 (9th Cir.), *cert. denied,* 444 U.S. 859, 100 S.Ct. 123, 62 L.Ed.2d 80 (1979); *United States v. Driver,*

---

**8.** By the Major Crimes Act of 1885, "Congress extended federal jurisdiction to crimes committed by Indians on Indian land out of a conviction that many Indians would 'be civilized a great deal sooner by being put under [federal criminal] laws and taught to regard life and the personal property of others.' 16 Cong.Rec. 936 (1885) (remarks of Rep. Cutcheon)." *Keeble v. United States,* 412 U.S. 205, 211–12, 93 S.Ct. 1993, 1997, 36 L.Ed.2d 844 (1973).

755 F.Supp. 885 (D.S.D.), *affirmed,* 945 F.2d 1410 (8th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1209, 117 L.Ed.2d 448 (1992) (criteria for § 1153 jurisdiction is some Indian blood, in this case ⁷⁄₃₂, and recognition as an Indian.)

Many other cases in which status as an Indian has been deemed relevant involve entitlement to property rights.

In *Halbert v. United States,* 283 U.S. 753, 51 S.Ct. 615, 75 L.Ed. 1389 (1931) plaintiffs sought enforcement of asserted rights to allotments in an Indian reservation. The suit was brought under the auspices of legislation which provided that a person who was "in whole or in part of Indian blood or descent" could sue in federal court for right to allotments in Indian land. In that case the court discussed the right to tribal land as dependent upon tribal membership and the complex rules in force at that time surrounding tribal membership for Indian women who marry white men. Under those rules unless the woman remained in the tribal environment after her marriage she lost her tribal membership. Moreover, the children took the status of the father unless he left them in the care of their mother within the tribal environment. Accordingly, children who had ½ Indian blood but did not live with the mother and the tribe would lose tribal membership.

Other rights and entitlements limited to "Indians" have led to numerous judicial determinations of who is an "Indian." *See e.g., Hoohuli v. Ariyoshi,* 631 F.Supp. 1153 (D.Haw.1986) (challenging classification system for designating Native Hawaiians under state constitutional amendment to benefit descendants from aboriginal people living in Hawaii before 1778); *United States v. State of Washington,* 476 F.Supp. 1101 (D.C.Wash. 1979) ("Indian" defined for purposes of entitlement to fishing rights under treaties); *Dillon v. State of Montana,* 451 F.Supp. 168 (D.Mont.1978), *reversed on other grounds,*

634 F.2d 463 (9th Cir.1980) (exemption from state tax laws); *Simmon v. Eagle Seelatsee,* 244 F.Supp. 808 (E.D.Wash.1965), *affirmed,* 384 U.S. 209, 86 S.Ct. 1459, 16 L.Ed.2d 480 (1966) (determination of whether state or tribal law applied to descent and distribution of property.)

In some areas of law Congress has specifically designated criteria for determining who is or is not an Indian. *See e.g., United States v. Curnew,* 788 F.2d 1335 (8th Cir.), *cert. denied,* 479 U.S. 950, 107 S.Ct. 438, 93 L.Ed.2d 387 (1986) (specified Congressional criteria for determining who may benefit from a statutory exception to a prohibition against entering the United States illegally due to status as American Indian born in Canada); *Witt v. United States,* 681 F.2d 1144 (9th Cir.1982) (Congressional determination of who may be designated an "Indian" or a "non-Indian" for purposes of distribution of government lands to Indian tribes under the Indian General Allotment Act, 25 U.S.C. § 334.)

Those cases in which the term "Indian" has been defined by Congress or by the judiciary arise out of the extensive legislation growing out of, and often replacing, the treaties which were historically the basis of Indian/United States dealings.[9] "[I]n dealing with Indians the Federal Government is dealing primarily not with a particular race as such but with members of certain social-political groups towards which the federal Government has assumed special responsibilities." F. Cohen, *supra,* at 5.

Because of this historical relationship between the United States and American Indians a substantial amount of legislation has developed which is unique to Indians and Indian tribes.[10] Such legislation generally distinguishes Native Americans from other Americans for purposes of application of particular rules, because the United States government has determined that American Indians have unique historical standing which

---

**9.** Section 6 of the Act of March 29, 1867, 15 Stat. 7, 9, repealed all laws allowing the federal government to enter into treaties with Indian tribes.

**10.** Indian tribes have laws applicable to them in the areas of gambling, Indian Gaming Regulatory Act, 25 U.S.C. § 2701–21; marriage and di-

vorce, 25 U.S.C. § 182; descent and distribution of tribal property, 25 U.S.C. § 371; and allotment of land, 25 U.S.C. § 331; without regard to federal and state laws in those areas applicable to other United States citizens.

places them outside certain legislative schemes applicable to other United States citizens. Indian legislation dissimilates, rather than assimilates, and, therefore, it is necessary to objectively define what individual or tribe falls under the auspices of any such particular law.

■ Title VII has an entirely different purpose. Title VII does not single out Indians for special benefits or treatment, but, rather, attempts to equalize the position of all employees, be they Native American, African–American, Hispanic, Asian or white. The statute addresses perceived differences which do not have a basis in fact between races and ethnic groups.[11] For example, when bringing an action under Title VII African–Americans do not have to demonstrate that their relatives lived in Africa, or that they visit the site of their roots, or that they are involved in any kind of cultural activities associated with Africa. They only have to appear to be African–Americans to be deemed members of that protected class.[12]

■ It is because Title VII is in force to equalize rather than separate that this Court finds that membership in a given protected class carries a lower threshold of proof than would be the case under entitlement legislation. With this in mind, this Court turns to the evidence before it for a determination of whether Plaintiff has demonstrated a genuine issue as to whether he belongs in a protected category.

In addressing this question, this Court is mindful of the holding in *Bennun v. Rutgers State University*, 941 F.2d 154 (3rd Cir. 1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 956, 117 L.Ed.2d 124 (1992), in which the

court found that the trial court did not err in finding that the plaintiff was Hispanic, for purposes of making out a prima facie case of employment discrimination in the context of Title VII.[13] The court's finding was based not upon the plaintiff's ancestry but, rather, "his birth in Argentina, his belief that he is Hispanic, identifies with and continues to adopt Spanish culture in his life and speaks Spanish in his home." *Id.* at 173. The court of appeals also noted that the district court had had an opportunity to observe the plaintiff's appearance, speech and mannerisms in determining his race.

This Court recognizes that in this case Defendants have submitted evidence suggesting that neither Plaintiff nor his immediate family are members of any tribe, live in an Indian community, or participate in Indian cultural events.

On the other hand, there is also evidence before this Court that Plaintiff has the physical appearance of an Indian, that he believes himself to be an Indian and has represented himself as such, and that heretofore Defendants apparently believed him to be an Indian. Moreover, Defendants concede that he may have some Native American blood, albeit less than $\frac{1}{16th}$.

This Court is not prepared to hold as a matter of law that one-sixteenth Indian blood, which Defendants seemingly concede Plaintiff may have, is insufficient to establish membership in a protected class, based upon national origin, as an American Indian.[14]

Further, the evidence relied upon by Defendants in support of the contention that Plaintiff is not an American Indian is not, in

11. Where perceived differences between groups do have a basis in fact they may justify discriminatory practices, as where there is a bona fide occupational qualification.

12. Perhaps if the government were to decide to compensate descendants of slaves for the wrongs done to their ancestors "African blood" would be a relevant area for which proof would be necessary for entitlement, but Title VII has a different purpose.

13. Because the district court had found that the plaintiff had made out a prima facie case on the basis of race, Hispanic, rather than national origin, Argentinean, the court of appeals only ad-

dressed whether the plaintiff had demonstrated membership in that racial classification, such as it is. The *Bennun* decision is the closest in point to this case which this Court has been able to find.

14. The cases in which specified criteria are listed for such determination do not preclude this conclusion. It is, however, noted that the burden of proving membership in a protected class is on Plaintiff, and that he has not presented any objective evidence as to his ancestry which would indicate that he, in fact, possesses $\frac{1}{16th}$ Native American blood.

this Court's opinion, sufficient to conclusively establish the accuracy of that proposition.

The fact that Plaintiff and members of his family have been listed on birth and death certificates as "white" is not dispositive.[15] In an essay submitted by Defendants as part of Ms. Shepherd's research the inaccuracy of such certificates, especially where "verry slitly mixt" tri-racial persons are involved, is not unheard of. Virginia Easley DeMarce, *"Verry Slitly Mixt": Tri-racial Isolate Families of the Upper South–A Genealogical Study*, 80 Nat'l Genealogical Soc'y 5, 7 (1992). Unions between Indian and English descendants tend to be disguised by the assumption of English names. *Id.* at 11. Moreover, seventy percent of American Indians marry outside their racial class, thereby making racial classification difficult. L. Wright, *supra*, at 49.

Defendants' showing of census listings is also not dispositive. Racial categorizations in the census have historically been dubious. *Id.* at 47 ("How unsettled this country has always been about its racial categories is evident in the fact that nearly every census since [1790] has measured race differently.")[16] The census does not require proof of ancestry. A person is listed on the census according to how he labels himself.[17] *See Morton v. Ruiz*, 415 U.S. 199, 224, 94 S.Ct. 1055, 1069, 39 L.Ed.2d 270 (1974).

As this Court believes that on the present record a jury issue exists on the factual issue of Plaintiff's heritage, it follows that Defendants' motion for summary judgment must be denied.

■ There is an alternative, and perhaps more significant, basis for this Court's determination that Defendants' motion must be denied, one that does not turn upon Plaintiff's ability to prove lineage.

The primary proof upon which Plaintiff rests his prima facie showing that he is a member of a protected class is the fact of his and his employer's belief in his status as an American Indian, added to which is his apparent physical resemblance to Native Americans and his family's belief in and propagation of his Indian heritage.

In the opinion of this Court, it is the employer's reasonable belief that a given employee is a member of a protected class that controls this issue. This Court believes that, consistent with the intent of Title VII, when racial discrimination is involved perception and appearance are everything.[18] As with

---

**15.** The possibility that American Indians may not have always clamored to be recognized as members of that society is not a great surprise. "In assessing the impact of science upon eighteenth- and nineteenth-century views of race, we must first recognize the cultural milieu of a society whose leaders and intellectuals did not doubt the propriety of racial ranking—with Indians below whites, and blacks below everybody else." Gould, *supra*, at 31.

**16.** In 1960 Latin–Americans were listed on the census as "white." When Hispanics became a protected class, however, the question of classifying within that group became troublesome. In 1970 there was a category for people from Central or South America. That category was often checked by people from central or south United States, causing a statistical nightmare. L. Wright, *supra*, at 52.

**17.** It is undisputed that a number of Plaintiff's ancestors listed themselves as "mulatto" i.e., having "black" blood. That is certainly an indication of minority status, albeit Black rather than Indian. Would it be a defense if an employer fired a plaintiff because the employer disliked African–Americans and believed the plaintiff, due to his dark skin, to be a member of that group, when, in fact, the plaintiff was a black Asian Indian, a group against which the employer did not intend to discriminate? Moreover, what if the employer replaced the employee believed to be African–American with a light skinned Indian? In that example the desire to engage in unlawful discrimination is present and the harm to the plaintiff is present, but the prima facie case is riddled with holes if the employer's perceptions in taking those steps is not considered to be a part of the discrimination equation.

**18.** This Court notes that racial distinctions have been made on a number of dubious "scientific" grounds, often toward the end of proving the inferiority of a particular group as compared to white European men.

For instance, it has been "scientifically" proven that blacks are intellectually inferior to whites, due to their smaller genu portion of the corpus callosum, the structure connecting the right and left sides of the brain. This conclusion was based on the "common knowledge" that intelligence is found in the forward portion of the brain and the genu is the forward portion of the corpus callosum. Stephen Jay Gould, *The Mismeasure of Man* 77 (W.W. Norton 1981).

the joy of beauty, the ugliness of bias can be in the eye of the beholder.[19]

So long as there is some objective evidence reflective of a basis for an employer's belief as regards an employee's Indian lineage this Court does not believe that it is necessary to resolve whether the employee is one percent Native American or one hundred percent Native American. That objective basis may consist of physical appearance, language, cultural activities, or associations, so long as any or all of those objective factors lead the employer to believe that a given employee is a member of that protected class, and to deal with him/her on that basis.

In the opinion of this Court this conclusion logically follows by the combined factors of racial ambiguity in today's heterogeneous society, Title VII's attempt to equalize the footing of all employees without regard to the employer's subjective perceptions and preconceived ideas, and the difficulty, perhaps even the impossibility with Native Americans, of establishing unquestionable genetic/hereditary classification.[20]

On the present record it appears to be unquestioned that the Plaintiff's physical appearance could be considered that of a Native American, that he believed himself and held himself out to be a Native American, and, most importantly, that he was considered by his employer and his co-workers to be Native American. Upon these facts, and under the law considered herein, for purposes of entitlement to relief under Title VII this Court deems it unnecessary, and indeed inappropriate, to attempt to measure Plaintiff's percentage of Indian blood or to examine his documentable connection to recognized existing tribes. Employers do not discriminate on the basis of such factors. Objective appearance and employer perception are the basis for discrimination and, in the opinion of this Court, the key factors relevant to enforcing rights granted members of a protected class.

Based upon these factors this Court concludes that, at the very least, Plaintiff has demonstrated a genuine factual issue as to his membership in a protected class entitling him to the protection afforded by Title VII.

Turning to Defendants' other motion for summary judgment, therein it is contended that Plaintiff cannot prevail on his claim for wrongful denial of promotions because evidence acquired after institution of this lawsuit revealed that Plaintiff's criminal record would have prevented him from holding any of the positions he allegedly was denied.

■ Defendants' argument rests on this Circuit's "after-acquired evidence" rule, which is usually applied in discharge cases and which:

> mandates judgment as a matter of law for an employer charged with discrimination if evidence of the plaintiff employee's misconduct surfaces at some time after the termination of the employee, and the employer can prove it would have fired the employee on the basis of the misconduct if it had known of it.

*McKennon v. Nashville Banner Pub. Co.,* 9 F.3d 539, 541 (6th Cir.1993), *cert. grant-*

---

The higher mental facilities of white men over Indians was "proven" by Samuel George Morton in his 1839 treatise, *Crania Americana,* by his exhaustive examination of the sizes of the brains of various Indians in the Western Hemisphere and comparing them to the brains of caucasians. In reviewing this study Stephen Jay Gould discovered that Morton had used a high percentage of physically small Indians while rejecting groups of caucasians which were smaller in stature, thus accounting for the brain size differential without regard to intelligence. Gould, *supra* at 57.

These "scientific" works were flawed by the fact that the scientist began with the preconceived notion that a particular group was inferior to whites, and as a result of this premise the studies were skewed (intentionally or inadver-

tently) to produce results proving the faulty premise. Gould, *supra,* at 68–69.

**19.** "There is nothing either good or bad but thinking makes it so." William Shakespeare, *Hamlet* Act 2, Scene II.

**20.** Although this opinion is written in general terms it is quite likely peculiarly relevant to American Indians (and perhaps other ethnic groups in the context of national origin discrimination), as opposed to African–Americans or other more readily identifiable minorities. As previously stated, it is difficult to imagine an employer challenging an employee's status as an African–American and requiring proof of ancestry in a Title VII case in which a black Plaintiff alleged employment discrimination.

ed, —— U.S. ——, 114 S.Ct. 2099, 128 L.Ed.2d 661 (1994).

The theory behind this rule is that a plaintiff suffers no legal damage by reason of alleged discrimination if he or she was not entitled to the job from which he or she was terminated. *Milligan–Jensen v. Michigan Technological Univ.,* 975 F.2d 302 (6th Cir. 1992), *cert. dismissed,* —— U.S. ——, 114 S.Ct. 22, 125 L.Ed.2d 773 (1993). The typical application of the after-acquired evidence rule is in cases in which after termination an employee is discovered to have falsified his or her employment application, when such falsification would have resulted in discharge if the employer learned of it during the period of employment. *See e.g., Id.* at 305; *Johnson v. Honeywell Information Systems, Inc.,* 955 F.2d 409 (6th Cir.1992). The Sixth Circuit has also held that removal of confidential documents from the place of business while employed, if such action would have resulted in discharge, will preclude liability for discrimination. *McKennon,* 9 F.3d at 543.

■ Based upon this doctrine Defendants contend that, without regard to whether or not they discriminated against him, Plaintiff is not entitled to relief because he had a previous drug conviction, which Defendants assert would have precluded his receiving the sought for promotions.

The following facts are undisputed with respect to this issue.

Plaintiff worked for the Department in a waste management operation licensed under O.R.C. § 3734.05. Ohio statutes and ordinances prohibit people with certain criminal backgrounds from holding "key" positions in operations licensed under O.R.C. § 3734.05. The positions sought by Plaintiff, "Site Supervisor I" and "Chief Operator I," are key positions.

Plaintiff has a criminal record including a conviction for drug abuse. If Plaintiff was to be considered by the Department for employment in a key position his drug offense would be required to be listed on a license application, and could be reason for denial of that application under O.R.C. § 3734.44.

An exception to this rule exists, however, in O.R.C. § 3734.44(C), which provides that a conviction for a named offense more than five years old may be disregarded and a license awarded if the key employee has become "rehabilitated" as determined by the Ohio Attorney General.

The issue of Plaintiff's alleged preclusion from a key position within the Department was brought before Judge Aldrich on a previous motion for summary judgment. In denying that Motion Judge Aldrich held:

> In the present case, Perkins acknowledges in his deposition that he pled guilty to a cocaine charge in the mid–1980's. This is supported by the Court of Common Pleas "Request for Employment Information" Report and Gary Kron's affidavit. However, the County has failed to produce evidence of Perkins' actual sentence for the conviction, which would elucidate whether he was convicted of a felony or a misdemeanor, and, in the case of a felony, whether five years had passed between the time Perkins was fully discharged from the offense and the time Perkins alleges the Title VII violations occurred. Therefore, a genuine issue of material fact remains.

> This Court is willing to entertain a renewed motion for summary judgment if the parties choose to rebrief this issue in greater detail. However, if Perkins was convicted of a misdemeanor or if, in the case of a felony, five years had elapsed between Perkins' sentence and the alleged Title VII violations, Perkins may be entitled to relief in the form of a promotion and back pay because an individual may be rehabilitated under § 3734.44(C)(1–9).

In the present motion Defendants have submitted a certified Journal Entry showing that Plaintiff was convicted of Drug Abuse other than Marijuana, a felony in the fourth degree, on June 3, 1985. It is undisputed that this conviction would have to be listed on a license application for a key position within the Department. The only issue remaining, therefore, is whether such conviction, being more than five years old, would preclude Plaintiff from being promoted to a key position.

The answer to that question turns on whether the Attorney General would consider Plaintiff to be rehabilitated within the meaning of O.R.C. § 3734.44.

In reference to that issue Defendants have submitted a copy of a letter from the Attorney General's office to Defendants' counsel in which the Attorney General stated in part:

I am somewhat reluctant to give your office what amounts to an advisory opinion about how the Attorney General's office would view Mr. Perkins if we were asked to make a recommendation about whether he has rehabilitated himself. As I mentioned, the statute requires us to do so under certain specified circumstances which do not obtain here. However, I understand that Judge Aldrich has asked you to clarify the situation so that the federal court can make an informed decision. As it stands now, based on a partial investigation and before any formal request for a recommendation, I believe the Attorney General would be likely to recommend that Mr. Perkins not be considered rehabilitated. The reason for my preliminary opinion is that when our investigator interviewed Mr. Perkins he lied, which of course makes him seem untrustworthy. In a key employee position where he would have discretion over waste disposal, an untrustworthy person could do enormous harm to the public if he chose to act unscrupulously.

Defendants argue that the correspondence from the Attorney General is the best evidence available concerning Plaintiff's suitability for promotion, and must be "accepted as proof of the Attorney General's intention not to consider plaintiff rehabilitated, [because] if plaintiff prevails, he will either be fired or the landfill will be closed by virtue of the loss of its license."

This Court does not agree. While the letter from the Attorney General's office is evidence that Plaintiff may not be entitled to a promotion to a key position, it is not proof of that fact. It is an equivocal statement based upon an admittedly incomplete investigation leading to a tentative conclusion.

The after-acquired evidence doctrine precludes liability when the employer can prove that the employee is not entitled to the relief sought. That proof is typically within the domain of the employer, because the employer is usually in control of requirements for employment. Such is not the case here.

Here the Attorney General's office, a non-party to this action, must determine whether Plaintiff is rehabilitated. Presumably, the Department may decline to promote the Plaintiff to a key position if such promotion would result in loss of the operator's license. Defendants, however, simply cannot say that a promotion of Plaintiff to a key position would have that result, without a definitive determination by the Attorney General on the question of rehabilitation.[21] For that reason, this Court believes that this is not an appropriate case for application of the after-acquired evidence rule by way of summary judgment.

For the foregoing reasons, Defendants' motions for summary judgment are denied.[22]

**IT IS SO ORDERED.**

---

**21.** Given the ability to afford "any other equitable relief as the court deems appropriate," 42 U.S.C. 2000e–5(g), if this Court were to find that Plaintiff had been discriminated against by Defendants a provisional order could be entered deferring final relief only after such determination by the Attorney General.

**22.** Defendants moved to strike certain of Plaintiff's exhibits. As those specified exhibits were not considered by this Court in rendering this opinion that motion is dismissed as moot.