**Horacio D. LEWIS, Plaintiff,**

v.

**STATE OF DELAWARE DEPARTMENT OF PUBLIC INSTRUCTION, Pascal D. Forgione, Jr., State Superintendent, both individually and in his official capacity, Valerie Woodruff, Associate State Superintendent, both individually and in her official capacity, and Jack Nichols, Associate State Superintendent, both individually and in his official capacity, Defendants.**

Civil Action No. 95–559 MMS.

United States District Court,
D. Delaware.

Dec. 4, 1996.

Daniel L. McKenty, of Wendelburg, McCullough & McKenty, P.A., Wilmington, DE; Of Counsel: John H. Morris, Jr., Baltimore, MD, for plaintiff.

Wendy A. Rising, and Michael F. Foster, Deputy Attorneys General, State of Delaware Department of Justice, Wilmington, DE, for defendants.

### OPINION

MURRAY M. SCHWARTZ, Senior District Judge.

## I. INTRODUCTION

Plaintiff Horacio D. Lewis filed this civil rights suit under 42 U.S.C. § 2000e *et seq.*, ("Title VII"), 42 U.S.C. § 1983, and 42 U.S.C. § 1981, alleging he was denied a promotion because of his race and national origin and in retaliation for filing a charge of discrimination with the EEOC. Specifically, he alleges he was unlawfully denied a "team leader" supervisory position for the State of Delaware Department of Public Instruction ("DPI"). Plaintiff sued DPI, the State Superintendent of DPI, an Assistant State Superintendent, and an Associate State Superintendent (collectively "defendants"). Plaintiff's claims against the DPI Superintendents are in both their official and individual capacities.

In response, the State filed a motion for summary judgment on behalf of all named defendants. The State's motion will be granted in part and denied in part.

## II. FACTS

Plaintiff is an African–American male who was born in Panama. Docket Item ("D.I.") 24, at 281. He has worked at DPI since 1977, and has consistently earned satisfactory performance reviews. D.I. 24, at 247–76.

Defendant Dr. Pascal D. Forgione ("Forgione") was hired as the State Superintendent of DPI in 1991. Shortly upon his arrival, he embarked upon an aggressive plan to diversify the DPI hierarchy.[1] In addition, he assisted in a bold design to reorganize DPI. D.I. 23, at 59–82. Members of the DPI staff identified and proposed nineteen teams within the four branches of DPI to improve the organization and structure of DPI. D.I. 23, at 95–115. One of those teams—the team most relevant for purposes of this motion—was the Equity and Special Programs Team.

Defendant Valerie Woodruff ("Woodruff"), brought to DPI by Forgione, is an Associate State Superintendent and Defendant Jack Nichols ("Nichols") is an Assistant State Superintendent. Both helped fill the team leader position which plaintiff claims he was discriminatorily denied. D.I. 23, at 146–53.

### The Equity & Special Programs Team

The Equity and Special Programs team was created to focus on the development and implementation of various equity issues in pre-school through adult programs in Delaware. D.I. 23, at 139. Equity issues encompass the following areas: multicultural education, desegregation, race and sex equity, vocational education, education for exceptional children, limited English proficiency education, migrant education and adult education. *Id.* From the time teams were introduced into DPI, plaintiff has been a member of the Equity and Special Programs team.

### Team Leaders

Defendant Forgione proposed that temporary "team leaders" be appointed for two-year terms to better coordinate the efforts of certain teams. D.I. 23, at 86. The temporary "team leader" concept arose out of a desire to give more than one member of the team a chance to lead. D.I. 26, at 706–07.

---

1. In fact, in his first year and a half at DPI, Forgione changed the senior management at DPI from 100% white male to 50% female and 17% racial minority. D.I. 25, at 328–34.

Funding was approved for nine team leader positions for fiscal year 1994. D.I. 23, at 136–38. Team leaders receive $7,000 in addition to their salaries as staff members; they also assume additional managerial and supervisory duties. D.I. 26, at 760. If replaced after two years, team leaders revert to positions as members of their respective teams. D.I. 26, at 706–07.

### The Team Leader Process—1993

In 1993, DPI assigned its staff to teams. D.I. 23, at 116. DPI then considered candidates to serve as team leaders; any member of the nine designated teams could apply for a team leader position by submitting an application and participating in an interview. D.I. 26, at 695. Field agents and education specialists outside of the team structure could also apply for the team leader position. D.I. 26, at 691–92.

DPI administration compiled a list of questions that team leader candidates were asked by panels of interviewers. The responses were scored on a scale of five (5) to twenty-five (25) in increments of five (5), with twenty-five (25) as the best possible score. D.I. 23, at 140. In addition, each interviewer rated each candidate as either "acceptable," "acceptable with reservations," or "unacceptable." *Id.* The interviewers used these ratings in recommending a team leader to defendant Forgione. Forgione, in turn, would either suggest the candidate as team leader to the State Board of Education ("the Board"), or set aside the interviewers' selection. D.I. 26, at 692.

Plaintiff, along with three other staff members, applied for the team leader position for the Equity and Special Programs team on March 26, 1993. D.I. 23, at 154–56. The three other candidates consisted of an African–American male, and two white females. D.I. 23, at 143. Defendants Woodruff and Nichols were assigned to review the applications and interview the four candidates for the Equity and Special Programs team leader position. D.I. 23, at 146–53. The candidates were judged "primarily on their managerial skills and their ability to coordinate and motivate members of the team, rather than the extent of expertise they may have in any given area." D.I. 26, at 760, ¶ 4.

After assessing the applications and interviewing the four candidates, Woodruff and Nichols recommended Dr. Fran Tracy–Mumford, a white female, as team leader. D.I. 23, at 144–45. Ronald Houston, an African-American male, ranked second. *Id.* Plaintiff finished third, and Kathleen McCormick, a white female, ranked fourth. *Id.* Forgione approved the decision and recommended Dr. Tracy–Mumford as team leader to the Board. D.I. 26, at 692. With the Board's approval, Dr. Tracy–Mumford became team leader for the Equity and Special Programs team. *Id.*

Only one African American applied for the position of team leader in the other eight teams. D.I. 23, at 142. She became team leader for the predominantly minority Child Nutrition team. D.I. 26, at 692.

On July 15, 1993, plaintiff filed a complaint with the Delaware Human Relations Commission and the United States Equal Employment Opportunity Commission ("EEOC"), alleging he was discriminatorily denied a team leader position on the basis of his race, national origin, and gender. D.I. 30, at 12. On June 15, 1995, the EEOC District Director issued a finding of probable cause of discrimination on the basis of race and national origin with regard to the selection of team leaders in 1993. In particular, the EEOC Director found DPI "utilized a highly subjective scoring process which resulted in a biased selection" and that it "appear[ed] that the State Superintendent [Forgione] intentionally failed to monitor the process to ensure fairness." D.I. 30, at Exhibits ("Exh.") 1–3.

### The Team Leader Process—1995

In 1995, the team leader process began anew. Again, candidates were sought for the position of team leader for the nine teams. Again, DPI used the same interviewing and application process it had used in 1993, but with some changes. There were three differences: first, the team leader position for the Child Nutrition team was dropped so the newly adopted Technology team could have a team leader, D.I. 26, at 622–23; second, while Defendant Woodruff again conducted interviews of applicants for the Equity and

Special Programs team leader position, two other DPI personnel replaced Defendant Nichols in the interviewing process, D.I. 26, at 767[2]; third, William Bowles, an African–American male, applied to be Equity and Special Programs team leader while Kathleen McCormick did not. D.I. 24, at 193.

After the 1995 interviewing process, William Bowles was recommended for the position of team leader. Among the candidates, Dr. Tracy–Mumford was ranked second, Ronald Houston ranked third and plaintiff ranked last. D.I. 24, at 193. The 1995 interviewing process featured something else in common with the 1993 process—threats of litigation. Dr. Tracy–Mumford and plaintiff made allegations of gender and racial discrimination, respectively, and plaintiff alleged DPI was retaliating against him for filing an EEOC charge in 1993. D.I. 26, at 716–18. When Forgione informed the State Board of Education that more litigation was likely to ensue after the latest round of team leader selections, the Board rejected the 1995 selections and reinstated the current team leaders (including Dr. Tracy–Mumford) while it reevaluated the concept of team leaders. D.I. 26, at 716–18. As a result, DPI has no African–American or Latino team leaders.[3]

Faced with yet another salvo of litigation, the Board decided to replace the temporary team leader positions with permanent management positions. *Id.* The permanent team leaders will be subject to discharge for unsatisfactory performance. *Id.*

## III. DISCUSSION

### A. Summary Judgment

The defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Rule 56 requires the Court to enter summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that

the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c).

"[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

Where there is a dispute, the non-moving party must place in the record sufficient evidence for the Court to find a genuine issue of material fact.

> The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case; and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

This Court is also guided by the maxim that "at the summary judgment stage, the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511. In sum, when reviewing this motion for summary judgment by DPI, this Court (1) resolves conflicting evidence in favor of plaintiff, (2) does not engage in credibility determinations, and (3) draws all reasonable inferences in favor of plaintiff. *See Sheridan v. E.I. DuPont de Nemours & Co.,* 100 F.3d 1061, 1072 (3d Cir.1996) (en banc); *Fuentes v. Perskie,* 32 F.3d 759, 762 (3d Cir.1994).

### B. Plaintiff Lewis' Title VII Claim—Disparate Treatment

#### 1. The Legal Standards

All claims of employment discrimination are scrutinized against the "shifting burdens" framework of the now familiar *McDonnell*

---

**2.** Apparently, the 1995 round of interviews, unlike the 1993 process, was conducted by three interviewers.

**3.** The reason there are no African–American or Latino team leaders is because the Child Nutrition team which was present in 1993 was dropped between 1993 and 1995.

*Douglas/Burdine/Hicks* cases and their progeny. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

■ In a case of failure to hire or promote under Title VII, the plaintiff must first establish a prima facie case of discrimination. This may be done by showing: (a) he belongs to a protected category; (b) he applied and was qualified for a promotion; (c) despite his qualifications, he was denied the promotion; and (d) other employees of similar qualifications who were not members of the protected group were promoted at the time the plaintiff's request for promotion was denied. *United States Postal Serv. Bd. of Governors v. Aikens*, 453 U.S. 902, 903 n. 1, 101 S.Ct. 3135, 3136 n. 1, 69 L.Ed.2d 989 (1981) (Marshall, J., dissenting); *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Lidge–Myrtil v. Deere & Co.*, 49 F.3d 1308, 1310 (8th Cir.1995); *Von Zuckerstein v. Argonne Nat'l Lab.*, 984 F.2d 1467 (7th Cir.), *cert. denied*, 510 U.S. 959, 114 S.Ct. 419, 126 L.Ed.2d 365 (1993); *Kenworthy v. Conoco, Inc.*, 979 F.2d 1462, 1469 (10th Cir.1992); *Molthan v. Temple Univ.*, 778 F.2d 955, 961 (3d Cir.1985) (holding educator has stated prima facie case by showing she was female, qualified for promotion to rank of professor, and "during the period of time in question at least one male was promoted to the rank of professor."); *Valentino v. United States Postal Serv.*, 674 F.2d 56, 63 (D.C.Cir.1982) (Ginsburg, J.); *Revis v. Slocomb Indus., Inc.*, 814 F.Supp. 1209, 1217 (D.Del.1993). The Supreme Court, moreover, has described the burden of establishing a prima facie case as

"not onerous." *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1094.[4]

■ Once plaintiff succeeds in presenting a prima facie case, the burden of production shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Fuentes v. Perskie*, 32 F.3d at 763. The employer satisfies this burden by introducing evidence to establish a legitimate nondiscriminatory reason for the unfavorable employment decision. *Hicks*, 509 U.S. at 511, 113 S.Ct. at 2749. The burden of persuasion remains at all times with the plaintiff. *Id.* After the defendant produces a legitimate, nondiscriminatory reason, the plaintiff can defeat summary judgment by pointing to some direct or circumstantial evidence from which a fact finder could reasonably either: "(1) disbelieve the employer's articulated legitimate reason; or (2) believe that an invidious discriminatory reason was more likely than not the motivating or determinative cause of the employer's action." *Sheridan*, 100 F.3d at 1067 (quoting *Fuentes*, 32 F.3d at 764); *Ezold v. Wolf, Block, Schorr & Solis–Cohen*, 983 F.2d 509, 523 (3d Cir.1992), *cert. denied*, 510 U.S. 826, 114 S.Ct. 88, 126 L.Ed.2d 56 (1993).

■ Thus, if he can sufficiently discredit the employer's articulated reason, the employee need not come forward with additional evidence of discrimination beyond the prima facie case. *Sheridan*, 100 F.3d at 1068–69; *Fuentes*, 32 F.3d at 764. Rather, a plaintiff can avoid summary judgment by producing evidence that would allow a fact finder reasonably to infer that "each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)."

---

4. The prima facie showing, while "not onerous," still serves a purpose; it "eliminates the most common nondiscriminatory reasons for the plaintiff's rejection." *Burdine*, 450 U.S. at 253–54, 101 S.Ct. at 1094. As the Court elaborated in *Furnco Construction Corp. v. Waters*:

> [W]e are willing to presume this [discrimination] largely because we know from our experience that more often than not people do not act in a totally arbitrary manner, without any

underlying reasons, especially in a business setting. Thus, when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with some reason, based his decision on an impermissible consideration such as race.

438 U.S. 567, 577, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978).

*Fuentes,* 32 F.3d at 764.[5]

■ The ultimate focus, it must be remembered, is on whether the employer has discriminated against a member of a protected class. Therefore, an employee cannot avoid summary judgment by showing the employer acted improvidently. Title VII does not command employers to be shrewd or wise or efficient; an employer is free to ruin his business with medieval practices, so long as those practices are not motivated by discriminatory animus. Rather, a plaintiff must cast "substantial doubt" upon the proffered legitimate reason by demonstrating "such weaknesses or implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them 'unworthy of credence[.]' " *Fuentes,* 32 F.3d at 765 (quoting *Ezold,* 983 F.2d at 531). *See also Sheridan,* 100 F.3d at 1072 (endorsing *Fuentes*). While this standard may place a difficult burden on plaintiffs, "[i]t arises from an inherent tension between the goal of all discrimination law and our society's commitment to free decisionmaking by the private sector in economic affairs." *Fuentes,* 32 F.3d at 765 (quoting *Ezold,* 983 F.2d at 531).

■ If a plaintiff cannot cast substantial doubt on the defendant's proffered reason, he can still avoid summary judgment by producing sufficient evidence that would allow a fact finder to reasonably infer the employer was motivated by discriminatory animus. *Id.* Such evidence could consist of showing the employer has discriminated against plaintiff or a protected class in the past. *Id.*

Finally, both the Supreme Court and Third Circuit Court of Appeals have warned against fixation with the shifting burden analysis. The Court of Appeals has frowned upon "excessive preoccupation with the various formulae used in an employment discrim-

ination case [because] they are simply tools designed to aid in the analysis of evidence. The ultimate question remains whether the defendant has discriminated. The presumption and shifting burdens are merely an aid—not ends in themselves." *Goodman v. Lukens Steel Co.,* 777 F.2d 113, 130 (3d Cir. 1985), *aff'd* 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987); *Paul v. F.W. Woolworth Co.,* 809 F.Supp. 1155, 1159 (D.Del.1992); *see also McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13 (noting that elements of prima facie case may vary depending on facts); *Roebuck v. Drexel Univ.,* 852 F.2d 715, 726 (3d Cir.1988) (adjusting prima facie elements in case involving denial of tenure); *Jackson v. United States Steel Corp.,* 624 F.2d 436, 440 (3d Cir.1980) (stating that elements of prima facie case as announced in *McDonnell Douglas* need not be present in every case).

With regard to the establishment of a prima facie case, the Court of Appeals has stated:

[C]ourts need not, and should not, stubbornly analyze all Title VII factual scenarios through the *McDonnell Douglas* formula. Instead, courts must be sensitive to the myriad of ways such an inference [of discrimination] can be created. Simply stated, a Title VII plaintiff has established a prima facie case when sufficient evidence is offered such that the court can infer that if the employer's actions remain unexplained, it is more likely than not that such actions were based on impermissible reasons.

*EEOC v. Metal Serv. Co.,* 892 F.2d 341, 348 (3d Cir.1990) (citations omitted).

### 2. Application to This Case
#### a) The Prima Facie Case.

■ Plaintiff has made a prima facie case of race and national origin discrimination.[6]

---

**5.** This is because, under *Hicks,* the fact finder's rejection of the employer's proffered legitimate reason permits, but does not compel, a finding of unlawful discrimination from the prima facie case. *See* 509 U.S. at 511, 113 S.Ct. at 2749; *Sheridan,* 100 F.3d at 1066.

**6.** Again, plaintiff must show (a) he belongs to a protected class; (b) he applied and was qualified for promotion; (c) he was denied the promotion despite his qualifications; and (d) other employees of similar qualifications who were not members of the protected group were promoted at the time plaintiff's request for promotion was denied. *Valentino v. United States Postal Serv.,* 674 F.2d at 63.

Plaintiff, as an African–American, belongs to a protected class. This much defendants concede. But defendants claim that plaintiff cannot demonstrate he should be protected from national origin discrimination simply because he was born in Panama. Defendants stress plaintiff's objective appearance is African–American, not Hispanic, and his primary language is English. *See Bennun v. Rutgers State Univ.*, 941 F.2d 154, 173 (3d Cir.1991) (opining that "[d]iscrimination stems from a reliance on immaterial outward appearances that stereotype an individual with imagined, usually undesirable, characteristics thought to be common to members of the group that shares these superficial traits."), *cert. denied,* 502 U.S. 1066, 112 S.Ct. 956, 117 L.Ed.2d 124 (1992).

But Plaintiff speaks Spanish fluently, and is an active and visible leader in the Latino community. D.I. 30, at 7, ¶ 13. Indeed, DPI management has utilized his bilingual skills to translate various documents. D.I. 30, at 22, ¶ 44. Finally, plaintiff alleges he speaks with an accent. D.I. 30, at Exh. 4. For purposes of summary judgment, plaintiff has established that he is part of a protected class for the purposes of a Title VII national origin discrimination claim. *Accord Perkins v. Lake County Dep't of Util.*, 860 F.Supp. 1262, 1278 (N.D.Ohio 1994) (enumerating physical appearance, language, cultural activities, and associations as objective factors, any or all of which would "lead the employer to believe that a given employee is a member of that protected class, and to deal with him/her on that basis.").

Plaintiff fulfills the other three elements of a prima facie case. As defendants concede, plaintiff was qualified for the position of team leader. He is well-published and nationally recognized for his work in the areas of multicultural education and educational equity. D.I. 30, at 8. He has advised three Delaware governors on equity and minority issues. *Id.* He has provided expert testimony in school desegregation cases. *Id.* Of the four candidates in 1993 and 1995, he had the most experience in DPI. By any account, plaintiff has an impressive resume; he was certainly qualified to be the team leader for the DPI Equity and Special Programs team.

It is also unquestionable that plaintiff was denied the promotion in 1993, and passed over in favor of a candidate (Dr. Tracy–Mumford) who did not belong in plaintiff's protected class. As for 1995, the fact an African–American candidate (William Bowles) was chosen as team leader does not necessarily negate the possibility of discrimination. Courts have deviated from the requirement that a plaintiff be replaced by someone of a different race; strict adherence would create a gaping loophole in Title VII in which an employer could cloak his discriminatory practices.[7] *See Paul,* 809 F.Supp. at 1162 (citing *Cygnar v. City of Chicago,* 865 F.2d 827, 842 (7th Cir.1989); *Pitre v. Western Elec. Co., Inc.,* 843 F.2d 1262, 1272 (10th Cir.1988); *DeLesstine v. Fort Wayne State Hosp.,* 682 F.2d 130, 133 (7th Cir.), *cert. denied,* 459 U.S. 1017, 103 S.Ct. 378, 74 L.Ed.2d 511 (1982); *Brooks v. Hilton Casinos,* 714 F.Supp. 1115, 1118 (D.Nev.1989)). Finally, it must be remembered plaintiff is a Latino from Panama, while Mr. Bowles is not a member of that protected class. As the Third Circuit Court of Appeals has recog-

---

7. For example, an employer could decide to promote only those African–Americans whose qualifications far exceed their white counterparts. *See Paul,* 809 F.Supp. at 1162. Or, consider the scenario painted by Deborah C. Malamud, an Assistant Professor of Law at the University of Michigan:

> Take the example of an employer in a low-skill, high-turnover business. Such an employer might decide, based on racial stereotypes, that black employees do not respond well to progressive discipline, and that it is more cost-effective to replace a black "bad apple" than to try to mend his ways. Such an employer might not be in the position to satisfy its true preference for white workers, perhaps because white workers are not available at the wage the employer can afford to pay. Instead, the employer would routinely replace black employees with new black employees, on the discriminatory assumption that it is cheaper to improve the black workforce by using turnover than by using progressive discipline. In such a case, there would be discrimination—the decision to replace black employees rather than to use progressive discipline would be racially motivated—but there would be no outside-the-group replacement.

Deborah C. Malamud, *The Last Minuet: Disparate Treatment After Hicks,* 93 Mich.L.Rev. 2229, 2295 (1995).

nized, the prima facie case is not inflexible; it should be modified to comport with the facts and claims presented in each case. *Torre v. Casio,* 42 F.3d 825, 830–31 (3d Cir.1994); *Weldon v. Kraft, Inc.,* 896 F.2d 793, 798 (3d Cir.1990). Thus, plaintiff has established a prima facie case for discrimination on the basis of race and national origin in violation of Title VII.

### b) Evidence of a Nondiscriminatory Reason.

■ The burden of producing a legitimate, nondiscriminatory reason for its action shifts to DPI. This burden is not heavy; in fact, it has been disparaged as "so light as to be trivial." Deborah C. Malamud, *The Last Minuet: Disparate Treatment After Hicks,* 93 MICH.L.REV. 2229, 2302 (1995). Under prevailing Supreme Court doctrine, even an "implausible," "silly," "fantastic," or "superstitious" reason will meet the rebuttal burden. *Id.* (quoting *Purkett v. Elem,* —— U.S. ——, ——, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995)). DPI has easily met this burden. It counters with a plausible reason; it elected to give Dr. Tracy–Mumford the position of team leader because she was more qualified than plaintiff and plaintiff was not a "team player." D.I. 26, at 767.

For the team leader position, DPI sought individuals who would provide leadership in building internal departmental teams and in working collectively with the team members to achieve a common goal. D.I. 26, at 719–23. While all of the candidates for the Equity and Special Programs team leader position had expertise in one of the eight areas covered by the team, none had expertise in all of the areas. D.I. 26, at 761. While plaintiff had accumulated numerous awards for his achievements in multicultural education, in DPI's opinion, plaintiff lacked experience working in a supervisory or cooperative capacity. D.I. 26, at 767.

Thus, DPI chose Dr. Tracy–Mumford as team leader for the Equity and Special Programs team in 1993. Like plaintiff, Dr. Tracy–Mumford is qualified for the position. She has expertise in adult education, an area encompassed by the Equity team. D.I. 26, at 762. She has demonstrated her leadership skills by heading the Graduation Requirements Task Force for the Delaware Board of Education. *Id.*

In 1995, William Bowles was recommended for the team leader position. There is no dispute that Bowles was also qualified to be team leader; he scored highest in the 1995 interview process. He also had significant supervisory and educational experience. D.I. 24, at 241–42.

### c) Pretext.

■ To avoid summary judgment, plaintiff must either (1) cast "substantial doubt" on DPI's reason to render it unworthy of credence, or (2) adduce evidence that DPI was motivated by discriminatory animus in its promotion decision. *Sheridan,* 100 F.3d at 1066–67; *Fuentes,* 32 F.3d at 764. To briefly outline his argument, plaintiff alleges his denial of promotion must be considered against a backdrop of a DPI history of "preselection" of non-minority candidates for promotion. In other words, plaintiff alleges the application and interview process for the team leader position was yet another example of a DPI "charade;" DPI, as it has demonstrated in the past, had already decided on the (white) candidate it would promote. Plaintiff asserts the comments made by DPI management and its retaliatory actions after he filed a charge of discrimination with the EEOC reinforce this view. After poring through the factual record and viewing all evidence in a light most favorable to plaintiff, this Court holds summary judgment should be denied.

### 1) Attempts to Discredit DPI's Articulated Legitimate Reasons

First and foremost, plaintiff asserts that his qualifications are second to none in the field of educational equity. In plaintiff's view, he was the only rational choice to lead the Equity and Special Programs team; the very fact that he was not chosen is evidence that DPI was discriminatory in its promotion practices. To bolster this position, plaintiff points to the comments made by the candidate ultimately selected as team leader in 1993, Dr. Tracy–Mumford. According to plaintiff, as soon as Dr. Tracy–Mumford learned of her recommendation as team lead-

er, she "burst into" his office and blurted, "I thought you would get it." D.I. 30, at 10, ¶ 18.

But plaintiff's opinion—or Dr. Tracy–Mumford's for that matter—of his suitability for the team leader position is not at issue. The opinions of the interviewing committee and Forgione—and whether they are racially or ethnically biased or not—are the determinative issues here. This is not a case where plaintiff's credentials so far outstripped his fellow applicants' that a choice of any other candidate would be wholly irrational. As the EEOC investigator notes, plaintiff indeed "had the most extensive and comprehensive experience in the field of equity and special programs." D.I. 30, at Exh. 1, p. 3. But experience in this field was not the sole determining factor. DPI was looking to fill the team leader position with somebody who could build consensus and assist staff members in working toward a common goal. D.I. 26, at 760 ¶ 4. Dr. Tracy–Mumford, selected in 1993, fit that bill. She had successful supervisory and management experience outside of DPI, and effectively conveyed the fruits of that experience through the interviewing process. William Bowles, recommended in 1995, demonstrated impressive management and leadership skills in the interviewing process.

But there is evidence to cast doubt on the reason proffered by DPI—that plaintiff is not "a team player." Plaintiff does admit he operated "with autonomy" as a staff member, and only reported "nominally" to the head of Internal Affairs. As a 1992 DPI performance evaluation indicates, however, he did have significant supervisory and managerial experience, and had little difficulty operating as an integral part of a "team." For instance, he served on Governor's Commissions and collaborated with DPI colleagues on multicultural education conferences. D.I. 24, at 246–49. He also directed a Multicultural Education Institute, which "attracted 36 statewide participants who received valuable information to be incorporated into local [multicultural education] efforts." D.I. 24, at

247. Further, plaintiff was noted for serving as a Title IV Program Director with the responsibilities of "management of budget, disbursement of funds, project/proposal development, and supervision of staff." D.I. 24, at 248. Finally, in a 1992 evaluation, plaintiff was lauded for his "ability to work effectively with others on committees, such as Teacher of the Year, and his work with the community and the Governor's Office speak to his efforts to promote an effective educational system."

Moreover, although experience was not the sole consideration in the process, the fact remains that among the candidates, plaintiff had the most seniority at DPI. D.I. 30, at 8, ¶ 14. He also had the most intensive and extensive experience on issues of educational equity, multicultural education, and special programs—all key areas under the purview of the Equity & Special Programs team. From these qualifications, the EEOC could not rule out discrimination, see D.I. 30 at Exh. 1–3; perhaps a jury will come to the same conclusion.

To further convince this Court the interviewing process was a sham, plaintiff presents evidence that, in his opinion, demonstrates DPI had chosen team leaders even before the interviewing process began.[8] First, there is the matter of the interviewing process itself. Defendant Nichols conceded in the EEOC investigative process that the interviewing rating system lacked "interrelater reliability." D.I. 30, at 9, ¶ 17. From this, the EEOC could not rule out the possibility that a DPI supervisor—namely, Forgione—intentionally turned a blind eye to racial discrimination. D.I. 30 at Exh. 1–3. Further, none of the interviewers took notes during the interview, D.I. 30, at 9, ¶ 16, and in 1995, plaintiff asserts that he had only one hour to complete the written portion of the interview, while he alleged other candidates took several days to respond. D.I. 30, at 19, ¶ 37.

Second, plaintiff alleges Forgione referred to persons as team leaders before they were ever selected. D.I. 30, at 11, ¶ 22. If this

---

**8.** As with most of the evidence discussed in the opinion, plaintiff presented this evidence by way of lengthy, sworn declarations.

testimony is believed, it would substantiate plaintiff's claim that the interviewing process was a sham. At summary judgment, this Court cannot weigh evidence or engage in credibility determinations. *See Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510–11; *Sheridan,* 100 F.3d at 1072 (explaining court "may not pretermit the jury's ability to draw inferences from the testimony, including the inference of intentional discrimination."). Rather it must evaluate all the evidence and draw all reasonable inferences in favor of plaintiff; this Court concludes plaintiff has cast sufficient doubt on the legitimate, nondiscriminatory reason articulated by DPI to survive summary judgment. *See Sheridan,* 100 F.3d at 1072–75 (holding plaintiff produced evidence of pretext by pointing to, *inter alia,* favorable performance reviews and merit raises). Whether he will succeed at trial is a different matter.

### 2) Evidence of Invidious Discrimination

Finally, according to plaintiff, minorities who express disappointment or file grievances with DPI are harassed and frozen out of opportunities for advancement, while white employees are rewarded for the same behavior. D.I. 30, at 3, ¶ 5. Plaintiff compiles in his declaration a list of examples in which minority employees at DPI were "harassed" or "frozen out of opportunities for advancement." D.I. 30, at 3, ¶ 5. Whether these accusations can be corroborated at trial with admissible evidence is a thorny issue for another day; at this stage, however, the Court cannot say they are utterly without probative value.

Therefore, plaintiff has introduced facts which both question the legitimate, nondiscriminatory reasons proffered by DPI and arguably support a claim for invidious discrimination. That is enough to get his disparate treatment claim past the summary judgment stage of these proceedings. The defendants' motion for summary judgment as to plaintiff's disparate treatment claim will be denied.

### C. Plaintiff Lewis' Title VII Claim— Disparate Impact

■ To establish a prima facie case of disparate impact discrimination, a plaintiff must demonstrate a specific employment practice resulted in a significantly adverse impact on a protected group. *Josey v. John R. Hollingsworth Corp.,* 996 F.2d 632, 642 (3d Cir.1993); *Newark Branch, NAACP v. Town of Harrison,* 940 F.2d 792, 798 (3d Cir.1991); *EEOC v. Metal Serv. Co.,* 892 F.2d at 348; *Paul,* 809 F.Supp. at 1159. While subjective or discretionary employment practices—like the promotion process here—may be analyzed under a disparate impact approach in appropriate cases, *see Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 991, 108 S.Ct. 2777, 2787, 101 L.Ed.2d 827 (1988), plaintiffs must show a reasonably refined statistical comparison between the racial composition of the at-issue jobs and the racial composition of the qualified population in the relevant labor market. *Wards Cove Packing Co., Inc. v. Atonio,* 490 U.S. 642, 650–51, 109 S.Ct. 2115, 2121, 104 L.Ed.2d 733 (1989) (quoting *Hazelwood Sch. Dist. v. United States,* 433 U.S. 299, 308, 97 S.Ct. 2736, 2742, 53 L.Ed.2d 768 (1977)).

■ Plaintiff has alleged DPI staff were promoted without official posting of the jobs, and with tacit encouragement of support from DPI management. D.I. 30, at 2 ¶ 4. Further, he asserts the interviewing process was biased against minority applicants. Even if this allegation is accepted as true, and even if it constitutes a specific employment practice, plaintiff has failed to make out a prima facie claim. He has not produced a reasonably refined statistical comparison to show a disparate impact on African–Americans or Latinos.

Defendant retained an expert who analyzed the composition of minorities employed by DPI. He concluded that minorities are adequately represented at DPI when compared to the qualified minority applicant pool in the Delaware labor market. D.I. 26 at 359–60. Plaintiff, on the other hand, has produced no expert, no expert report, and no material basis which refutes the findings of defendant's expert. He has not compared the racial composition of DPI managerial employees with the qualified applicant pool. Instead, plaintiff compares the minorities

employed in supervisory or managerial positions at DPI with the number of minorities employed in professional positions by the individual school districts in Delaware. D.I. 30 at 23–24, ¶ 46. This comparison has no basis in law, logic, or statistical method. It is meaningless for disparate impact purposes. Plaintiff has failed to present a prima facie case of disparate impact. Accordingly, his claim of disparate impact under Title VII will be dismissed.

### D. Plaintiff Lewis' Title VII Claims—Retaliation

 Plaintiff alleges DPI retaliated against him for filing a charge of discrimination with the EEOC. The controlling standards are quite plain. To establish a prima facie case, plaintiff must show (1) he engaged in protected activity; (2) he was subjected to an adverse employment action subsequent to or contemporaneously with such activity; and (3) a causal link exists between the protected activity and the adverse employment action. *Delli Santi v. CNA Ins. Co.*, 88 F.3d 192, 198 (3d Cir.1996); *Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194, 201 (3d Cir.1994).

Plaintiff clearly engaged in protected activity when he filed a charge of discrimination with the Delaware Human Relations Commission and the EEOC on July 15, 1993. Despite defendants' protestations to the contrary, a denial of promotion is considered an adverse employment action. *Marmino v. Perry*, 27 F.3d 572 (8th Cir.1994); *Rollins v. State of Florida Dep't of Law Enforcement*, 868 F.2d 397 (11th Cir.1989); *United States v. City of Montgomery*, 744 F.Supp. 1074, 1080 n. 11 (M.D.Ala.1989), *aff'd*, 911 F.2d 741 (11th Cir.1990).

Plaintiff cannot claim he was denied the team leader position in 1993 on a retaliatory basis, however; the denial was the subject of his charge of discrimination. The only denial of promotion that can be considered in retaliation for plaintiff's charge is the choice for team leader in 1995—*nearly two years* after plaintiff filed his original charge. Although the "mere passage of time is not legally conclusive proof against retaliation," [9] *Robinson v. Southeastern Pa. Transp. Auth.*, 982 F.2d 892, 894–95 (3d Cir.1993), courts have often required a temporal proximity between the adverse employment action and the protected activity. For example, the Third Circuit Court of Appeals has expressed serious doubt that an adverse action can be causally linked to an employee's protected action taken almost two years previously in the absence of an intervening pattern of antagonism or retaliation. *Robinson*, 982 F.2d at 895. *See also Woods v. Bentsen*, 889 F.Supp. 179, 187–88 (E.D.Pa.1995) (holding as a matter of law "an adverse employment action, occurring a significant period of time following the exercise of rights afforded under Title VII, does not create an inference of causation in the absence of other evidence."); *Harley v. McCoach*, 928 F.Supp. 533, 542 (E.D.Pa.1996) (same).

But the lengthy time lapse is not dispositive in this case. The denial of promotion in 1995 was the very first decision on team leader promotion following his complaint in 1993. *Accord Coates v. Dalton*, 927 F.Supp. 169, 171 (E.D.Pa.1996). Further, plaintiff has alleged intervening acts—albeit minor, perhaps trivial acts—of antagonism and retaliation.[10] Therefore, plaintiff has established enough of a causal link between his filing an EEOC charge and the denial of promotion in 1995 to survive summary judgment.

---

9. Nor should it be. Otherwise, an employer could simply wait for a certain length of time before punishing the employee for his activity. *Coates v. Dalton*, 927 F.Supp. 169, 170 (E.D.Pa. 1996).

10. For example, Lewis declares that since he filed his EEOC charge, he was subjected to various forms of "bureaucratic resistance," "challenges to his professional judgment," and "unfounded charges of insubordination." D.I. 24 at 292. He then proceeds to compile a litany of gripes. While DPI has offered legitimate explanations for most of them, the Court simply cannot weigh the credibility of witnesses at summary judgment. Thus, Lewis' allegations must be accepted for what they are: some evidence of antagonism—however tenuous—by DPI employees.

### E. Plaintiff Lewis' Claims Under 42 U.S.C. § 1981 [11]

■ Lewis cannot state a claim for damages against DPI under § 1981. As the United States Supreme Court flatly held, "Congress intended that the explicit remedial provisions of § 1983 be controlling in the context of damages actions brought against state actors alleging violation of the rights declared in § 1981." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 731, 109 S.Ct. 2702, 2721, 105 L.Ed.2d 598 (1989). There is no question DPI is a state actor. Thus, the express cause of action for damages created by § 1983 [12] constitutes the "exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units." *Id.* at 733, 109 S.Ct. at 2722.

But the "exclusive federal remedy" of § 1983 is unavailable to Lewis. First and foremost, he never included DPI as a defendant in his § 1983 claim. D.I. 11 at 18. But even if he had, DPI is a state agency; as such, it is immune from legal claims in a § 1983 suit. *See Quern v. Jordan*, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979); *Manchester v. Rzewnicki*, 777 F.Supp. 319, 326 (D.Del.1991) (action against Division of Accounting and the Department of Finance of the State of Delaware), *aff'd*, 958 F.2d 364 (3d Cir.1992). Therefore, plaintiff's § 1981 damages claims against DPI will be dismissed.

■ Lewis has not given a hint of what equitable relief he is seeking or would be proper in this case. The Court speculates that he will ask to be placed in a team leader position. Such relief is not available, however, in this action. First, it is worth noting that DPI does not place the team leaders; the Board has that duty. Further, the Board has not been named as a defendant in this case. Finally, it appears as if the Board, under threat of litigation, is on the brink of scrapping the whole team leader concept in favor of the permanent manager system that was previously in place. For all these reasons, plaintiff's request for injunctive relief under § 1981 will be dismissed.

### F. Individual Liability of Defendants Woodruff, Nichols, and Forgione

Plaintiff has asserted actions based on Title VII and 42 U.S.C. §§ 1981 & 1983 against Woodruff, Nichols, and Forgione in both their individual and supervisory capacities. These will be discussed below.

#### 1. Title VII—Individual Capacity

■ Plaintiff argues defendants Woodruff, Nichols, and Forgione should be held liable as individual employees under Title VII. Title VII prohibits employers from engaging in certain employment practices, *see* 42 U.S.C. § 2000e–(2)(a)(1). Employer is defined as "a person engaged in an industry affecting commerce who has fifteen or more employees ... and any agent of such a person...." *Id.* § 2000e(b). Plaintiff thus claims that Woodruff, Nichols, and Forgione, as agents of DPI, may be held personally liable.

Plaintiff's argument has been rejected by the Third Circuit Court of Appeals in *Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d at 1076–79. The *Sheridan* court, after thoroughly reviewing the text, history, and purposes of Title VII, as well as relevant decisions of other courts of appeals, concluded that Congress did not intend to provide for individual liability under Title VII. *Id.*

The Third Circuit Court of Appeals has clearly spoken on the issue; defendants Woodruff, Nichols, and Forgione may not, under any set of facts, be held individually liable for Title VII violations. Accordingly,

---

11. Section 1981 provides:

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, ... and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens...."

12. Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

the Title VII claims against Woodruff, Nichols, and Forgione must be dismissed.

### 2. *Sections 1981 & 1983—Official and Individual Capacity*

#### a) *Action for Damages*

##### 1) *Official Capacities*

■ Plaintiff alleges unlawful conduct by Woodruff, Nichols, and Forgione in their official capacities as superintendents for DPI. This district has held in the past that a complaint alleged against an official of a state department is a suit against that official's office. *Manchester*, 777 F.Supp. at 326. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989) (holding suits for damages against state officers in their official capacities are barred). The court in *Manchester* held that such a suit is no different than a suit against the State itself, and since a State is not a person for purposes of a § 1983 action, a § 1983 action against defendants in their official capacities must be dismissed. *Manchester*, 777 F.Supp. at 326. Accordingly, both the § 1983 and the § 1981 actions [13] against defendants Woodruff, Nichols, and Forgione in their official capacities must be dismissed.

##### 2) *Individual Capacities*

■ Section 1983 actions for damages can be brought, however, against state officials acting in their individual capacities. *Hafer v. Melo*, 502 U.S. 21, 25, 112 S.Ct. 358, 362, 116 L.Ed.2d 301 (1991) (distinguishing official capacity suits from individual capacity suits on basis that official capacity suits are attempt to sue government entity by naming officer as defendant, while individual capacity suits "seek to impose individual liability upon a government officer for actions taken under color of state law."). A § 1983 action requires that (1) the conduct complained of must be committed by a person acting under color of law; and (2) the conduct deprived plaintiff of a right or privilege guaranteed by the Constitution or the laws of the United States. *Hafer*, 502 U.S. at 27–28, 112 S.Ct.

at 362–63; *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *House v. New Castle County*, 824 F.Supp. 477, 482 (D.Del.1993). There is no disputing defendants Woodruff, Nichols, and Forgione—as supervisors in DPI—are state actors. There is also no dispute plaintiff has a constitutional and statutory right to be free from invidious discrimination in employment based on his race or national origin. As detailed in this Court's discussion of the claims against DPI, plaintiff has adduced enough evidence at this stage to support his theory that defendants Woodruff, Nichols and Forgione deprived plaintiff of his rights under the Constitution or federal laws.

■ Further, to hold a supervisory official liable under § 1983, the plaintiff must allege the supervisor engaged in affirmative conduct that played a role in the discrimination. *Al–Khazraji v. Saint Francis College*, 784 F.2d 505, 518 (3d Cir.1986) (holding, in § 1981 action, "[i]f individuals are personally involved in the discrimination ..., and if they intentionally caused the College to infringe ... Section 1981 rights, or if they authorized, directed, or participated in the alleged discriminatory conduct, they may be held liable."). *Long v. Board of Educ. of Philadelphia*, 812 F.Supp. 525, 530 (E.D.Pa.1993) (similar holding in § 1983 action) (citing *Rizzo v. Goode*, 423 U.S. 362, 370–71, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976)). Again, viewing the facts through the procedural prism of a summary judgment motion, plaintiff has raised an issue of fact as to whether the individual defendants deliberately denied him a promotion due to his race. Defendants Woodruff and Nichols were responsible for interviewing candidates in 1993, and Forgione was responsible for implementing the team leader system. Plaintiff has placed in the record evidence suggesting the whole process was discriminatory and the individual defendants each played an integral and di-

---

**13.** The same analysis holds true for Lewis' § 1981 claim against the individual defendants in their official capacities. The Supreme Court has denominated § 1983 as the "exclusive federal remedy" for damages against state actors.

*Jett*, 491 U.S. at 733, 109 S.Ct. at 2722. Further, since Woodruff and Nichols were state actors, Lewis can only bring a § 1983 claim (which precludes damages for the reasons stated in text).

 

rect role in that process; at this point, he has enough evidence to bring his case to trial.

 The individual defendants have raised the defense of qualified immunity. This defense shields government officials performing discretionary functions from civil damages so long as their conduct does not violate clearly established statutory or constitutional rights. *Harlow v. Fitzgerald,* 457 U.S. 800, 818–19, 102 S.Ct. 2727, 2738–39, 73 L.Ed.2d 396 (1982); *Henry v. Perry,* 866 F.2d 657, 659 (3d Cir.1989); *Cooper v. Merrill,* 736 F.Supp. 552, 560 (D.Del.1990). *See also Alexis v. McDonald's Restaurants of Mass.,* 67 F.3d 341, 348 n. 7 (1st Cir.1995); *Auriemma v. Rice,* 910 F.2d 1449, 1454–55 (7th Cir.1990), *cert. denied,* 501 U.S. 1204, 111 S.Ct. 2796, 115 L.Ed.2d 970 (1991) (both cases recognizing possibility of qualified immunity in suits against government officials under § 1981). A right is "clearly established" if the contours of that right were sufficiently clear so that a reasonable official would realize his actions violated that right. *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987).

Here, plaintiff alleges the intentional discriminatory denial of promotion based on his race. Freedom from race discrimination in the workplace and the guarantees of equal protection are "well grounded in law and widely known to the public." *See Andrews v. City of Phila.,* 895 F.2d 1469, 1479 (3d Cir. 1990); *Johnakin v. City of Phila.,* 1996 WL 18821, at *7 (E.D.Pa. Jan. 18, 1996). This Court does not necessarily accept plaintiff's version of the promotion process; instead, it recognizes merely that there is an issue of fact to prevent the issuance of summary judgment. Accordingly, this Court will not dismiss plaintiff's § 1983 claim on the basis of the qualified immunity defense raised by the individual defendants.[14]

#### b) Injunctive Relief

Plaintiff calls, however nebulously, for injunctive relief from defendants Woodruff, Nichols, and Forgione. Sections 1981 & 1983 may be used to obtain prospective injunctive or declaratory relief and attorneys' fees from

14. *See supra* note 13.

state officials. *See Hafer,* 502 U.S. 21, 112 S.Ct. 358. As noted in section III(E) of this opinion, however, none of the individual defendants can provide injunctive relief. None has the power to place plaintiff in a team leader position; each merely makes recommendations, which eventually go to Forgione, who in turn would recommend a candidate to the Board. Indeed, at oral argument, counsel for defendants pointed out that Forgione had since taken a position with the Presidential Administration; he would not be able to provide injunctive relief, even if this Court ordered it. The Board then makes an ultimate decision on who will serve as team leader. Thus, only the Board can give plaintiff the relief he presumably seeks—a position as the Equity and Special Programs team leader. Accordingly, plaintiff's claims for injunctive relief against the individual defendants will be dismissed.